

F I L E D
FEB 2 4 2015
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**MUWAKKIL S.B. SHABAZZ,**

     Plaintiff,

v.                                Civil Action No. **3:12CV282**

**GENE JOHNSON, *et al.*,**

     Defendants.

## MEMORANDUM OPINION

Muwakkil S.B. Shabazz, a Virginia inmate and a member of the Nation of Islam ("NOI"),

brings this 42 U.S.C. § 1983[1] action alleging that Defendants[2] violated his First[3] and Fourteenth[4]

---

[1] That statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

[2] Shabazz names the following seventeen defendants: (1) Gene M. Johnson, the former director of the Virginia Department of Corrections ("VDOC"); (2) Harold W. Clarke, the current director of the VDOC; (3) John M. Jabe, former deputy director of the VDOC; (4) G. Robinson, Ombudsman Services Unit Manager; (5) A. David Robinson, Chief of Operations; (6) Louis B. Cei, Special Operations Manager; (7) Wendy S. Hobbs, Regional Administrator; (8) Linda Shear, Chief Dietician; (9) Mark Engelke, Director of Food Service Operations; (10) Ralph Abernathy, former food service manager; (11) George Hinkle, former warden; (12) Benjamin A. Wright, former warden; (13) V.M. Washington, former warden; (14) J. Everett, Staff Specialist Senior; (15) Paul Beighley, Chaplain; (16) Daniel W. Anderson, Chaplain; and, (17) Timothy Puryear, Inmate Program Manager.

[3] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I.

[4] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

Amendment rights and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").[5]

The action proceeds on Shabazz's Particularized Complaint. ("Complaint," ECF No. 29.)

Specifically, Shabazz asserts:[6]

Claim One:     By refusing to provide Shabazz with a diet in conformity with his religious beliefs, Defendants violated (a) the First Amendment and (b) RLUIPA.

Claim Two:     Defendants violated Shabazz's right to equal protection by refusing to provide him with a Nation of Islam ("NOI") diet.

Claim Three:   By refusing to provide Shabazz with sufficient time to worship, Defendants violated (a) the First Amendment and (b) RLUIPA.

Claim Four:    Defendants violated Shabazz's right to equal protection by providing insufficient time for him to worship.

Claim Five:    By denying Shabazz the right to purchase and wear bowties, Defendants violated (a) the First Amendment and (b) RLUIPA.

Claim Six:     Defendants violated Shabazz's right to equal protection by denying him the right to purchase and wear bowties.

Claim Seven:   By denying Shabazz access to NOI programs on cable television, Defendants violated (a) the Equal Protection clause and (b) RLUIPA.

(*See* Compl. 11–16.) Shabazz seeks declaratory, injunctive, and monetary relief.[7] Defendants

have filed a Motion for Summary Judgment. For the reasons set forth below, the Court will

---

[5] Religious Land Use and Institutionalized Persons Act ("RLUIPA") of 2000, 42 U.S.C. §§ 2000cc *et seq.*

[6] The Court corrects the capitalization and punctuation and removes emphasis from Shabazz's submissions.

[7] Shabazz brings this action against Defendants in their individual and official capacities. RLUIPA fails to authorize a private cause of action for money damages against state officials in their official or personal capacities. *Sossamon v. Texas*, 131 S. Ct. 1651, 1663 (2011) (holding that state officials sued in their official capacities enjoy Eleventh Amendment Immunity against RLUIPA claims for damages); *Rendelman v. Rouse*, 569 F.3d 182, 189 (4th Cir. 2009) (concluding that, as an exercise of Congress's spending clause authority, RLUIPA failed to authorize claims for monetary damages against state officials in their individual capacities); *see Haight v. Thompson*, 763 F.3d 554, 569–70 (7th Cir. 2014) (concluding that, as an exercise of Congress's authority under the Commerce Clause, RLUIPA failed to authorize claims for

GRANT Defendants' Motion for Summary Judgment with respect to Claims Two, Three (a) and (b), Four, Five (a) and (b), Six, and Seven (a) and (b). The Court DENIES WITHOUT PREJUDICE Defendants' Motion for Summary Judgment with respect to Claims One (a) and (b).

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility to inform the court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)).

In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere scintilla of evidence will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (citing *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1871)). "'[T]here is a

monetary damages against state officials in their individual capacities). Accordingly, Shabazz's demands for monetary damages with respect to RLUIPA are DISMISSED.

preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the *onus* of proof is imposed.'" *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'" *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

As pertinent here, in support of their Motion for Summary Judgment, Defendants rely upon: (1) an affidavit of A. David Robinson (Mem. Supp. Mot. Summ. J. Attach. 1, ECF No. 40–1 ("Robinson Aff.")); (2) VDOC Operating Procedure § 841.3 (*id.* Encl. A); (3) VDOC Operating Procedure § 802.1 (*id.* Encl. B); (4) an affidavit of J. Everette (*id.* Attach. 2, ECF No. 40–2 ("Everette Aff.")); (5) an affidavit of Mark Engelke (*id.* Attach. 3; ECF No. 40–3 ("Engelke Aff.")); (6) the VDOC Food Service Manual (*id.* Encl. A); (7) a copy of the NOI menu provided at Buckingham Correctional Center (*id.* Encl. B); (8) a copy of the Common Fare Agreement signed by Shabazz (*id.* Encl. C); and (9) an affidavit of Paul Beighley (*id.* Attach. 4, ECF No. 40–4 ("Beighley Aff.")).

In response, Shabazz submits: (1) his own declaration (Resp. Mot. Summ. J. Attach 1, ECF No. 46–1 ("Shabazz Decl.")); and (2) an affidavit of Johnathan Lee X Smith, a frequent litigant in the Court (*id.* Attach 2, ECF No. 46–2 ("Smith Aff.")). Additionally, Shabazz swore under penalty of perjury to the truth of his statements in his Complaint.

In light of foregoing submissions and principles, the following facts are established with respect to the Motion for Summary Judgment.

## II. SUMMARY OF PERTINENT FACTS

### A.    Common Fare Diet

Shabazz is confined in the Greensville Correctional Center ("GCC").  (Shabazz Decl.

¶ 3.)  Shabazz is a member of the NOI.  (*Id.*)  Shabazz participates in the Common Fare diet.

(Compl. ¶ 18.)  "The Common Fare diet was designed specifically to meet the dietary needs of

offenders who, for religious reasons, require a Kosher non-pork diet and whose dietary

requirements cannot be accommodated with foods provided" by the regular menu ("Master

Menu").  (Engelke Aff. ¶ 4.)  "Appropriate procedures are in place to ensure that food service

workers . . . receive appropriate training and supervision in the proper handling of Common

Fare food.  (*Id.*)  "The Common fare menu has been analyzed and certified as meeting or

exceeding minimum daily nutritional requirements."  (*Id.* ¶ 5.)  The Islamic leader of the Islamic

Center for Virginia has affirmed that the Common Fare diet meets Islamic guidelines.  (*Id.*)

Those offenders on the Common Fare diet who sign up as Islamic offenders are also allowed to

participate in religious observances such as Ramadan and NOI Month of Fasting.  (*Id.*)

Prior to the creation of the Common Fare diet, the Buckingham Correctional Center

served special meals to NOI offenders in accordance with a court order.  (*Id.* ¶ 6.)  Buckingham

"is not a Common Fare facility"; however, a few offenders remaining at the facility were

"grandfathered" in and continue to receive special NOI meals provided by an outside vendor.

(*Id.*)  These meals include fish, and the cost per meal is approximately $2.70, compared with

$1.35 for a Common Fare meal.  (*Id.*)

Currently 3,000 offenders participate in the Common Fare diet.  (*Id.* ¶ 7.)  "All offenders

approved for the Common Fare diet are required to sign a Common Fare Agreement."  (*Id.*)

Shabazz signed his agreement on August 6, 2012.  (*Id.*)  "By signing this agreement, Shabazz

acknowledged that the Common Fare provides [him] with an appropriate religious diet that meets or exceeds daily nutritional requirements." (*Id.* Encl. C; *see id.* ¶ 7.)[8]

VDOC food service provides inmates who eat from the regular serving line with a meat alternative at each meal. (*Id.* ¶ 8.) Offenders who do not eat meat may select the alternative at each meal. (*Id.*) Beans are offered for lunch and dinner meals. (*Id.*) When the breakfast meal contains meat, cheese or peanut butter is offered as an alternative. (*Id.*) "Because the regular menu includes legumes, dairy products and eggs, inmates who choose not to eat meat nevertheless receive adequate nutrients necessary to a healthy diet." (*Id.*)

The Common Fare diet is not served cafeteria-style like the regular meal. (*Id.* ¶ 9.) "The Common Fare trays must be pre-made, covered and maintained at a specific temperature." (*Id.*) For this reason, offenders who participate in the Common Fare diet are unable to select alternative menu items from the Common Fare menu. (*Id.*) Offenders may purchase approved food items such as peanut butter from the commissary. (*Id.*) The "planned Common Fare menu may not be changed at the facility level, except where seasonal availability of produce items warrant substitutions be made." (*Id.* Encl. A, "Food Service Manual," at V.C.)

### B.   Shabazz's Dietary Demands

Shabazz is a vegetarian. (Compl. ¶ 18.) Shabazz met with Defendant Abernathy to explain that the Common Fare diet "does not accommodate his Religious Dietary Tenets that [are] outlined in *How to Eat to Live*, by the Most Honorable Elijah Muhammad, Volumes I and II." (*Id.*) Shabazz filed an informal complaint, regular grievance, and two appeals regarding his desire to have a diet in accord with *How to Eat to Live*, and Defendants Abernathy, Washington, and Hobbs informed him that the Common Fare diet met his religious dietary needs. (*See*

---

[8] On the signed form, Shabazz wrote: "I am signing this under duress, that I will be removed off the diet if I don't!" (Engelke Aff. Encl. C (capitalization corrected).)

6

Compl. ¶¶ 19–23 (citing Ex. A, at 1–7).) Shabazz states that "his dietary tenets, require him to

train himself to eat only one (1) meal every twenty-four hours, with no in between snacks." (*Id.*

¶ 18.) According to Shabazz, he "has lost about 20 lbs. of his bodily weight" from prison

officials' refusal to provide him with an NOI diet. (*Id.* ¶ 30.) Shabazz states that both the Master

Menu and the Common Fare diet "violate[ ] my religious dietary requirements," so he "opted for

the Common Fare because it is the lesser of two evils." (Shabazz Decl. ¶ 7.)

According to Johnathan Lee X Smith, *How to Eat to Live* requires NOI believers to

"'eventually wean'" themselves off meat and marine life. (Smith Aff. ¶ 14.) Smith explains that

in 1998, the Honorable Louis Farrakan ordered all NOI members to stop eating meat and all

marine life. (*Id.* ¶ 15.) Smith explains that:

> 18. *How to Eat to Live* expressly says that the annual diet of members of
> the Nation of Islam is to consist[ ] of fresh, cooked spinach, cauliflower, rhubarb,
> eggplant, red cabbage, broccoli, white cabbage, okra, carrot, navy (pea) beans,
> asparagus, brussel sprout[s], turnip root, browned rice, white corn in its milk
> stage, and whole wheat bread that has been slowly baked twice and then allowed
> to set for 2-3 days before eaten. It requires us to eat fresh fruit and to drink
> bottled fruit juices. It says that our food must be prepared and cooked in the
> manner prescribed by God through the most Honorable Elijah Muhammad in
> *How to Eat to Live*. Our drinking water must be boiled and strained with cheese
> before we drink it.
> 19. *How to Eat to Live* expressly forbids members of the Nation of Islam
> to use . . . utensils that have been used to prepare, cook, bake, or eat pork, it's by
> products, and other religiously unacceptable food.
> 20. *How to Eat to Live* expressly forbids members of the Nation of Islam
> pork and its by products, canned food, white flour, white bread, freshly baked
> bread, freshly baked pastry, white potatoes, sweet potatoes, pancakes, French
> toast, syrup, margarine, macaroni, spaghetti, kidney beans, pinto beans, black-
> eyed peas, fried food, white rice, processed food[s], corn bread, peanut butter,
> scrambled eggs, dry cereal, wet cereal, stir fried vegetables, collard greens, kale
> salad, soy bean[s], jelly, baked beans, artificial food.
> 21. *How to Eat to Live* expressly forbids members of the Nation of Islam
> to eat food that has been prepared and cooked by disbelievers or unbelievers in
> our Islamic faith.
>    . . . .
> 25. *How to Eat to Live* forbids members of the Nation of Islam, including
> Plaintiff, Shabazz, to eat a diet that consists primarily of uncooked vegetables,

> such as the Common Fare Menu, because of the many poisonous chemicals sprayed on the vegetables . . . and because the human digestive tract was not designed by its Creator to digest raw vegetables.

(*Id.* ¶¶ 18–21, 25.) According to Smith, the Master Menu and Common Fare diet are unacceptable to members of the NOI under *How to Eat to Live*. (*Id.* ¶¶ 22–23.)

### C.   Worship Services

The VDOC contracts with Chaplain Services of Virginia to provide services including formal worship, religious education, pastoral counseling and care, and the coordination of religious volunteers in the VDOC facilities for all faiths. (Robinson Aff. ¶ 4.) The Chaplains also provide general support for all denominations including arranging space and time for services and obtaining religious publications. (*Id.*) The VDOC funds these representatives from the commissary funds, and no state or federal money is used for the services. (*Id.*) The VDOC shows no preference to the activities of any religious group. (*Id.*) "The amount of hours and space allocated to religious groups is based on the number of offenders participating in the program and availability of volunteers and staff resources." (*Id.*)

"Since April 1, 2011, Chaplain Services has subcontracted with Muslim Chaplain Services to provide services to the VDOC including, but not limited to, formal Muslim worship, religious education, pastoral counseling," and obtaining "VDOC approved materials needed to provide Muslim faith-based services." (*Id.* ¶ 5.) Offenders may participate in on-site Jumu'ah services and religious counseling and may receive VDOC approved religious publications. (*Id.*)

Paul Beighley, has served as the institutional Chaplain since 2001. (Beighley Aff. ¶ 1.) He explains that the Nation of Islam offenders meet every Friday from 1:30 p.m. to 3:30 p.m. (*Id.* ¶ 5.) Despite certain NOI offenders desiring more frequent meetings, the GCC "[is] unable to accommodate their request due to a lack of volunteers." (*Id.*) Moreover, NOI offenders "will

not allow someone from outside their faith to lead or teach. We have tried to secure volunteers from the Nation of Islam leadership; however, at present there is only one volunteer for this group and he serves all correctional facilities in the state." (*Id.*) Beighley explains that "offenders are encouraged to reach out for approved volunteers as well." (*Id.*)

Offenders at GCC are allowed to observe holy days, seasons, and participate in their NOI Month of Fasting as well as special feasts. (*Id.* ¶ 6.)

Shabazz submits a document entitled "Greensville Chaplain's Department Request to Attend Religious Services" that provides the schedule for religious services at GCC. (Compl. Ex. D, at 1.) According to the form, all religions have a two-hour service each week with the exception of Protestant inmates who have an additional two-hours of bible study allotted. (*Id.*)

According to Shabazz, observers of NOI should participate in Friday Jumu'ah prayer services for one hour, a religious class called "Self-Improvement: Basis for Community Development" for two hours, Fruit of Islam training for two hours, and congregate worship services for two hours. (Compl. ¶ 42.)

Johnathan Lee X Smith states that from August 1, 2011 until July 6, 2013, he served as Student Minister of the NOI in S3 Cluster at GCC. (Smith Aff. ¶ 31.) "During that time [Smith] conducted worship service, religious study groups, and led religious programs for the Nation of Islam with the knowledge and acquiescence of Chaplain Beighley . . . ." (*Id.*) As of July 10, 2014, Shabazz was the Student Minister of the NOI in S1 Cluster at GCC. (Shabazz Aff. ¶ 3.) In this role, Shabazz "lead[s] and conduct[s] all group worship, religious classes, and religious study groups for the Nation of Islam in S1 Cluster . . . except when our outside religious volunteer is present at this prison . . . ." (*Id.* ¶ 4.)

9

### D.   Bowties

Shabazz desires to wear "clip-on bow ties and/or clip on neckties" to religious services. (Compl. ¶ 47.) Inmates may submit requests for religious items not specifically authorized in VDOC Operating Procedure § 802.1 "Offender Property." (Robinson Aff. ¶ 6 (citing Encl. B).) Such inmate requests are reviewed by the Warden or his designee and forwarded to the Faith Review Committee (FRC) in accordance with VDOC Operating Procedure § 841.3. (*Id.*) Robinson, the Chief of Corrections Operations has final authority to approve or disapprove requests submitted to the Faith Review Committee. (*Id.* ¶ 7.) Robinson recalls no inmate request to the FRC for bowties. (*Id.* ¶ 6.)[9]

Robinson explains that, even if a request had been made, he "cannot justify the security risks which would be created if ties and/or clip-on bowties were allowed as personal property." (*Id.* ¶ 7.) Pursuant to Operating Procedure § 841.3.VII.O.13.a, "[n]o item shall be approved if possession of the items comprises the security and safety of the facility." (*Id.* (quoting § 841.3.VII.O.13.a).) "Certainly ties could be used as a weapon, and the metal clip attached to bowties could be removed and fashioned into a weapon," and therefore, such items pose a risk. (*Id.*) Robinson avers that during his career in prison administration, he has "witnessed numerous instances of inmates fashioning weapons from ordinary items." (*Id.*) The VDOC had to change the type of eyeglass frames issued because inmates removed wires to make weapons. (*Id.*) Inmates have melted small, square candy and fashioned weapons. (*Id.*) Thus, due to overriding security concerns, Robinson avers that inmates are not permitted to have ties, including bow ties. (*Id.*)

---

[9] Shabazz submits various informal complaints, grievances, and appeals to demonstrate he exhausted his administrative procedures for this request for bowties. (*See* Compl. Ex. E.) None of these documents establish that Shabazz made a request to the FRC for bowties, just that he grieved generally.

### E.  Religious Television Programming

According to Shabazz, Jewish and Christian inmates have access to religious programs on cable television and the "programs are aired twenty-four (24) hours daily." (Compl. ¶ 56.) Defendants have "either refused or ignored [Shabazz's] request to be provided access to N.O.I. programs" on cable television. (*Id.* ¶ 57.)[10]

Shabazz is confined in a general population housing assignment in the GCC. (Everette Aff. ¶ 4.) Inmates housed in general population are allowed to have a television in their cell with a cable connection and may watch any of the channels offered. (*Id.*) Three televisions are also mounted in the pod area. (*Id.*) Security staff control and determine which channels inmates view based on what the majority of offenders want to watch. (*Id.*)

The GCC receives cable television services through a contract with Correctional Cable TV, Inc. (*Id.*) The channels offer mostly secular entertainment with some religious channels. (*Id.*) The GCC is "limited in [its] ability to select specific programs" from Corrections Cable. (Robinson Aff. ¶ 8.) If Minister's Farrakhan's sermons are not aired on cable television channels, Shabazz may request to view DVDs or listen to sermons on CD of Minister Farrakhan's sermons through the institutional Chaplains. (*Id.*; Everette Aff. ¶ 5.)

The institutional Chaplain also affirms that he has no control over cable programming at VDOC facilities. (Beighley Aff. ¶ 7.) Chaplain Services maintains approximately forty (40) DVDs of Minister Farrakhan's sermons for review by inmates. (*Id.*)

---

[10] Shabazz states in a conclusory fashion that: "[E]ven though Minister Farrahkan's daily and weekly sermons and Nation of Islam programs are aired via cable television, Defendants have refused, and are currently refusing, to make these sermons and programs available to me as they have done for Christian and Jewish prisoners since 2009." (Shabazz Decl. ¶ 15.) Shabazz provides no admissible evidence to support his conclusion. Shabazz fails to provide any facts indicating that he has personal knowledge about whether Minister Farrahkan's daily and weekly sermons or NOI programs are aired on cable television. *See* Fed. R. Civ. P. 56(c)(4).

### III.   RLUIPA AND FREE EXERCISE CLAIMS

### A.   RLUIPA

RLUIPA provides, in pertinent part, that:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person—
> **(1)** is in furtherance of a compelling governmental interest; and
> **(2)** is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).  Thus, to begin, Shabazz must demonstrate that Defendants' policies impose a "substantial burden" on his religious exercise.  In determining if Shabazz has met this standard, the Court must answer two questions: "(1) Is the burdened activity 'religious exercise,' and if so (2) is the burden 'substantial'?" *Adkins v. Kaspar*, 393 F.3d 559, 567 (5th Cir. 2004); *see Couch v. Jabe*, 679 F.3d 197, 200–01 (4th Cir. 2012) (employing similar two-part inquiry).

### B.   Whether the Burdened Activities Are a Religious Exercise

"RLUIPA defines the term 'religious exercise' broadly to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'" *Couch*, 679 F.3d at 200 (quoting 42 U.S.C. § 2000cc–5(7)(A)).  Shabazz's claims implicate four distinct activities:[11]  (1) eating a diet consistent with the book *How to Eat to Live* by Elijah Muhammad (Claim One (b)); (2) having sufficient time for NOI religious services (Claim Three (b)); (3) having the ability to wear bow ties to religious services (Claim Five (b)); and (4) watching Farrakhan sermons available on cable television (Claim Seven (b)).  Shabazz swears that his

---

[11] As Defendants correctly assert, several of the claims Shabazz lists under his RLUIPA claim section merely repeat his equal protection claims and do not state a RLUIPA claim.  For example, Shabazz faults Defendants for "providing other prisoners sufficient time for their worship services, while denying him sufficient time for his worship services." (*See* Compl. 15–16.)  The Court generously construes Shabazz to raise four factual scenarios that he alleges violate RLUIPA as outlined above. (*See* Compl. 15–16.)

faith motivates him to eat a diet consistent with *How to Eat to Live* (Shabazz Decl. ¶ 7) and to engage in a specific period of religious activities each week (Compl. ¶ 42). Shabazz only vaguely suggests that his faith motivates him to wear a bow tie or watch sermons of Minister Farrakhan on cable television. Nevertheless, given RLUIPA's broad definition of religious exercise, and the Defendants' failure to address this portion of the inquiry, the Court assumes these activities constitute religious exercise. *See Whitehouse v. Johnson*, No. 1:10cv1175 (CMH/JFA), 2011 WL 5843622, at *3 (E.D. Va. Nov. 18, 2011) (assuming inmate's enrollment in seminary course constituted religious exercise for purposes of RLUIPA).

### C. Whether Shabazz Demonstrates a Substantial Burden on His Religious Exercise

RLUIPA fails to define the term substantial burden. *See Couch*, 679 F.3d at 200. The United States Court of Appeals for the Fourth Circuit determined that the Supreme Court's jurisprudence interpreting the Free Exercise Clause provides guidance on the issue. *See Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006). Thus, the Fourth Circuit has explained that a substantial burden

> is one that put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs, or one that forces a person to choose between following the precepts of h[is] religion and forfeiting [governmental] benefits, on the one hand, and abandoning one of the precepts of h[is] religion . . . on the other hand.

*Couch*, 679 F.3d at 200 (alterations and omission in original) (quoting *Lovelace*, 472 F.3d at 187). In conducting the substantial burden inquiry, the plaintiff "is not required . . . to prove that the exercise at issue is required by or essential to his [or her] religion." *Krieger v. Brown*, 496 F. App'x 322, 325 (4th Cir. 2012) (citing *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005)). Nevertheless, "at a minimum the substantial burden test requires that a RLUIPA plaintiff demonstrate that the government's denial of a particular religious . . . observance was

13

more than an inconvenience to one's religious practice." *Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007) (citing *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004));[12] *see Krieger*, 496 F. App'x at 326 (affirming grant of summary judgment where inmate failed to "show that the deprivation of an outdoor worship circle and the requested sacred items modified his behavior and violated his religious beliefs" (citing *Lovelace*, 472 F.3d at 187)). Thus, no substantial burden occurs if the government action merely makes the "religious exercise more expensive or difficult," but fails to pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his religion. *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007).

Two recent cases from the Fourth Circuit illustrate a plaintiff's responsibility with respect to demonstrating a substantial burden. In *Couch*, the plaintiff "testified that the primary religious texts of Islam command that he grow a beard and that the refusal to maintain a beard is a sin comparable in severity to eating pork." *Couch*, 679 F.3d at 200. The VDOC's grooming policy prohibited inmates from growing beards and enforced this rule by placing a noncompliant inmate in a program that "restricted or limited [the inmate's] access to personal property, movement rights, the right to eat and associate with others, recreation time, and visitation time." *Id.* at 199. The Fourth Circuit concluded that VDOC's grooming policy and enforcement mechanism, "fit squarely within the accepted definition of 'substantial burden'" because it placed substantial pressure on the plaintiff to modify his behavior and violate his beliefs. *Id.* at 200–01 (citing *Warsoldier v. Woodford*, 418 F.3d 989, 995–96 (9th Cir. 2005)).

In *Krieger*, the Fourth Circuit declined to find an inmate had demonstrated a substantial burden where prison officials denied "his requests for an 'outdoor worship circle' and certain

---

[12] In *Sossamon v. Texas*, 131 S. Ct. 1651, 1663 (2011), the Supreme Court abrogated *Smith*'s ultimate holding that RLUIPA allows for monetary damages against state officials acting in their official capacity.

'sacred items' related to his religious practice of Asatru." *Krieger*, 496 F. App'x at 322. The plaintiff "asserted that deprivation of the outdoor worship circle would require him to pray indoors, and that the 'Blot' ceremony is '*best* performed outdoors.'" *Id.* at 325 (emphasis added). The Fourth Circuit concluded that the mere denial of the optimal manner for performing the "Blot" ceremony could not demonstrate a substantial burden where the plaintiff "failed to offer any explanation regarding the reason why indoor worship would compromise his religious beliefs." *Id.* Similarly, the inmate failed to demonstrate a substantial burden with respect to the denial of additional sacred items simply by the "blanket assertion" that "the sacred items were 'necessary' to perform 'well-established rituals.'" *Id.* at 326. The Fourth Circuit noted that plaintiff "did not identify those rituals, or explain why the absence of the sacred items had an impact on the rituals and violated his beliefs." *Id.*

*Krieger* illuminates another consideration in conducting the substantial burden inquiry. The availability to an inmate, in the most general sense, of other means to practice his or her faith is not relevant to the RLUIPA substantial burden inquiry. *Al–Amin v. Shear*, 325 F. App'x 190, 193 (4th Cir. 2009). "Nevertheless, courts properly consider whether the inmate retains other means for engaging in the particular religious activity, such as the "Blot" ceremony, in assessing whether a denial of the inmate's preferred method for engaging that religious exercise imposes a substantial burden." *Shabazz v. Va. Dep't Corr.*, 3:10CV638, 2013 WL 1098102, at *7 (E.D. Va. Mar. 15, 2013) (citing *Krieger*, 496 F. App'x at 326; *Coleman v. Governor of Mich.*, 413 F. App'x 866, 875–76 (6th Cir. 2011)). Thus, an inmate failed to demonstrate the denial of additional group study time imposed a substantial burden upon his religious exercise where prison officials already provided three hours of group study and worship time and allowed inmate to study in his cell. *See Van Wyhe v. Reisch*, 581 F.3d 639, 656–57 (8th Cir. 2009).

Similarly, the United States Court of Appeals for the Sixth Circuit concluded that prison policies which limited the inmates' access to religious radio and television broadcasts failed to substantially burden the inmates' religious exercise because the inmates "may receive religious literature via the mail and may receive visitors at the prison to discuss their religious beliefs." *Coleman*, 413 F. App'x at 876.  As explained below, in light of the foregoing principles, Shabazz fails to demonstrate any substantial burden upon his religious exercise with respect to Claims Three (b), Five (b), and Seven (b).  Due to the lack of adequate briefing with regard to Claim One (b), the Court declines to dismiss Claim One (b) at this time, and will order further briefing.

### 1.   Diet

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must [demonstrate] that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (noting that the doctrine of *respondeat superior* is inapplicable to § 1983 actions).  "To survive summary judgment, a plaintiff claiming a violation of § 1983 must produce evidence that the defendant knew of a deprivation and 'approved it, turned a blind eye to it, failed to remedy it, or in some way personally participated.'" *Oakley v. Cowan*, 187 F. App'x 635, 638 (7th Cir. 2006) (some internal quotation marks omitted) (quoting *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)).  "Absent direct participation, there must at least be a showing that the defendants 'acquiesced in some demonstrable way' in the alleged violation." *Id.* (quoting *Palmer v. Marion Cnty.*, 327 F.3d 588, 594 (7th Cir. 2003)).

In his Complaint, Shabazz provides facts indicating that Defendants Abernathy, Washington, and Hobbs had personal involvement in the refusal to remedy his demands to receive a religiously appropriate diet (Claim One (b)). (*See* Compl. ¶¶ 18, 22, 23.) While

16

Shabazz names all seventeen Defendants in this claim, he fails to demonstrate that any but the above-named three had any direct involvement or personal responsibility in the alleged deprivation of his rights.[13]   Accordingly, Defendants Johnson, Clarke, Jabe, G. Robinson, A. David Robinson, Cei, Shear, Engelke, Hinkle, Wright, Everett, Beighley, Andersen, and Puryear are DISMISSED as Defendants from Claim One (b).  For the same reason, Defendants Johnson, Clarke, Jabe, G. Robinson, A. David Robinson, Cei, Shear, Engelke, Hinkle, Wright, Everett, Beighley, Andersen, and Puryear are DISMISSED from corresponding Claim One (a).

Shabazz avers that "the Common Fare diet 'does not' accommodate his religious dietary tenets" as explained in *"How to Eat to Live* by the Most Honorable Elijah Muhammad . . . ." (Compl. ¶ 18.)  Shabazz alleges in his Complaint that the Common Fare diet is inadequate for two reasons: (1) because his "dietary tenets, require[ ] him to train himself to eat only one (1) meal every twenty-four hours, with no in between snacks" (*id.*); and (2) and his religion requires him to be a vegetarian. (*Id.*)  In Johnathan Lee X Smith's affidavit, Smith expands upon Shabazz's claim as alleged in the Complaint and avers that dozens of menu items included in the Common Fare diet are forbidden by the religious dictates in *How to Eat to Live*. (*See* Smith Aff. ¶¶ 18–25.)

In their Motion for Summary Judgment, Defendants fail to adequately address Shabazz's claim that receiving the Common Fare diet places a substantial burden on his religious exercise. Defendants provide little more than the legal standard for claims brought pursuant to RLUIPA.

---

[13] Johnathan Lee X Smith avers that in or around 1988 he provided unspecified "Defendants" with a copy of the book *How to Eat to Live*. (Smith Aff. ¶ 12.)  This vague statement is insufficient to demonstrate that the named Defendants in this action had personal knowledge and were personally involved in the alleged deprivation of Shabazz's rights. *See United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004) (citation omitted) (internal quotation marks omitted) (concluding that "[a]iry generalities [and] conclusory assertions . . . [do] not suffice to stave off summary judgment . . . .").

Defendants briefly conclude that Shabazz fails to state a RLUIPA claim based upon his desire for a religious diet. Defendants, however, provide neither citations to the evidence nor persuasive legal authority to support their conclusion.

First, Defendants fail to address whether receiving a diet in accordance with *How to Eat to Live* is a religious exercise or whether Defendants have placed a substantial burden on this religious exercise by failing to provide such a diet. Second, Defendants fail to address the expanded testimony Shabazz offers through Smith's affidavit that the Common Fare menu is insufficient for NOI inmates.[14] Third, while Shabazz maintains that the Defendants' failure to provide a diet that complies with NOI dietary restrictions violates his religious beliefs, the current record fails to establish whether differences exist between the dietary requirements of NOI and other Muslim sects, and, if so, whether the Common Fare diet is nonetheless sufficient. Defendants also fail to adequately demonstrate whether accommodating NOI requirements would be feasible and nutritionally adequate, the cost of altering the Common Fare menu to accommodate Shabazz's religious needs, or the potential cost of accommodating numerous strands of religious dietary restrictions. *See DePaola v. VDOC*, No. 7:12–cv–00592, 2014 WL

---

[14] For example, the record fails to demonstrate whether or not Shabazz exhausted his administrative remedies with regard to complaints other than that he desired to eat a vegetarian diet or eat once a day with no snacks. On the current record, the Court fails to discern whether Shabazz notified Defendants of the specific foods on the Common Fare diet he now claims he cannot eat and whether Defendants made any attempt to address his concerns. *See, e.g.*, *DePaola v. VDOC*, No. 7:12–cv–00592, 2013 WL 6804744, *1–2 (W.D. Va. Dec. 20, 2013) (highlighting similar inadequacies in Defendants' motion for summary judgment). Moreover, Defendants fail to address whether the Court should entertain this expanded claim as alleged by Smith in his affidavit supporting an opposition to a motion to dismiss. *See, e.g.*, *Mathie v. Goord*, 267 F. App'x 13, 14 (2d Cir. 2008) (holding that district court cannot consider new claims asserted in opposition to motion to dismiss); *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (holding that plaintiff cannot amend his complaint to add a new claim in a memorandum).

1766098, at *3 (W.D. Va. May 2, 2014) (finding similar inadequacies in the defendants' motion for summary judgment addressing an NOI inmate's challenge to the Common Fare diet).

Balancing the above interests with the general rule that a party shall not file separate motions for summary judgment, *see* E.D. Va. Loc. Civ. R. 56(C),[15] the Court concludes the appropriate disposition is to deny without prejudice the Motion for Summary Judgment with respect to Claim One (b). Defendants shall have twenty (20) days to resubmit their Motion for Summary Judgment with respect to this claim. The Memorandum in Support of the Motion for Summary Judgment must adequately brief the remaining claims and any such affirmative defenses Defendants intend to raise.

### 2. Adequate Time for Worship

In Claim Three (b), Shabazz argues that Defendants "refus[e] to afford him sufficient time for worship services." (Compl. 16.) Shabazz fails to adequately articulate how Defendants are providing him insufficient time for worship. First, Shabazz argues that Defendants are denying NOI inmates equal amount of time for religious services as Christian inmates. Shabazz avers that NOI followers must participate in "Jumu'ah prayer (Friday Prayer Services) for an hour," a religious class called "Self-Improvement: Basis for Community Development" for two hours," a weekly "Fruit of Islam" class for two hours, and congregate worship for two hours. (*Id.* ¶ 42.) Shabazz at no point demonstrates that Defendants have prohibited him from engaging in these religious activities. Instead, the record demonstrates that NOI inmates have congregate worship services on Fridays and then Student Ministers like Johnathan Lee X Smith and Shabazz "lead and conduct all group worship, religious classes, and religious study groups for the Nation

---

[15] Unless permitted by leave of Court, a party shall not file separate motions for summary judgment addressing separate grounds for summary judgment. E.D. Va. Loc. Civ. R. 56(C)

of Islam in S1 Cluster . . . except when our outside religious volunteer is present at this prison . . . ." (Shabazz Decl. ¶ 4.) Shabazz fails to demonstrate a substantial burden on his religious exercise by his vague, unsupported assertion that Defendants have refused to provide him sufficient time for worship services. *See Van Wyhe*, 581 F.3d at 656–57.[16] Accordingly, Claim Three (b) will be DISMISSED.

### 3.   Bowties

In Claim Five (b), Shabazz contends that Defendants have violated RLUIPA by "authorizing other prisoners to purchase and wear [religious clothing], while denying him the right to purchase and wear bow ties as mandated by his religious beliefs and practices." (Compl. 16.) Shabazz claims that Defendants denied his request "to be allowed to purchase and wear 'clip-on bow ties and/or clip-on neckties' to his religious services." (*Id.* ¶ 9.) Shabazz fails to adequately articulate the religious significance of wearing a bow tie during "religious services" such that the lack of a bow tie places a substantial burden of his religious exercise. *See Krieger*, 496 F. App'x at 326 (concluding inmate's "blanket assertion" "that the sacred items were 'necessary' to perform 'well-established rituals'" was insufficient to establish a substantial burden when inmate failed to "identify those rituals, or explain why the absence of the sacred items had an impact on the rituals and violated his beliefs"); *see also DeSimone v. Bartow*, 355 F. App'x 44, 46 (7th Cir. 2009) ("noting the insufficiency of a plaintiff's 'unreasoned say-so' to create a triable issue" (quoting *Borzych v. Frank*, 439 F.3d 388, 390 (7th Cir. 2006))); *Marron v. Jabe*, No. 1:12cv468(TSE/TRJ), 2014 WL 585850, at *5 n.5 (E.D. Va. Feb. 14, 2014) (citations

---

[16] To the extent Shabazz prefers to engage in these religious services and classes outside of his cluster, he fails to demonstrate a substantial burden on his religious exercise. *Shabazz v. Va. Dep't Corr.*, 3:10CV638, 2013 WL 1098102, at *7 (E.D. Va. Mar. 15, 2013) (no substantial burden when inmate denied "preferred method for engaging [in] that religious exercise" when inmate "retain[ed] other means for engaging in the particular religious activity" (citing *Krieger*, 496 F. App'x at 326; *Coleman*, 413 F. App'x at 875–76).

omitted).  Moreover, Shabazz fails to demonstrate that Defendants' refusal to allow him to purchase and wear bow ties substantially pressures him "'to modify his behavior and to violate his beliefs.'"  *Couch*, 679 F.3d at 200 (quoting *Lovelace*, 472 F.3d at 187)); *see Coleman*, 413 F. App'x at 875–76.  Because Shabazz fails to demonstrate that Defendants placed a substantial burden on his religious exercise, Claim Five (b) will be DISMISSED.

### 4.    NOI Sermons on Cable Television

In Claim Seven (b), Shabazz argues that Defendants have violated RLUIPA by "providing prisoners of the Jewish and Christian faiths daily access to religious programs of their respective faiths via cable television, while denying him access to N.O.I. programs via cable television." (Compl. 16.)  Shabazz wholly fails to demonstrate how the inability to watch NOI sermons on cable television places a substantial burden on his religious exercise.

Shabazz, at most, demonstrates that the inability to receive NOI sermons on cable television hampers one method for him to study the sermons of NOI ministers.  "RLUIPA does not require the prison to permit an inmate to [obtain] every tangential item of property that could aid the inmate's religious exercise or learning." *Van Wyhe*, 581 F.3d at 657.  The record demonstrates that Shabazz remains free to watch the more than forty DVDs available from the Chaplain in order to view sermons of NOI ministers.[17]  Moreover, Shabazz offers no evidence that he cannot receive NOI sermons through other sources such as newspapers, books, cassettes or CDs.[18]  *See Coleman*, 413 F. App'x at 876 (concluding no substantial burden when inmates

---

[17] Shabbazz complains that these DVDs are "old" (Shabazz Decl. ¶ 15), but fails to demonstrate how his subjective view about the age of the sermons substantially burdens his religious exercise.

[18] In a prior case filed by Shabazz, he acknowledged that prison officials allowed him "to purchase publications [and] subscriptions to The Final Call newspaper, which carr[ies] a portion of [Minister Farrakhan's] sermons in every issue . . . ." *Shabazz*, 2013 WL 1098102, at *5 (alteration in original) (citation omitted).

who were denied religious television and radio programming, had the ability to "receive religious literature via the mail and . . . receive visitors at the prison to discuss their religious beliefs").

Given the ample opportunities Shabazz retains to view and study the sermons of NOI ministers, Shabazz fails to demonstrate Defendants' failure to offer NOI sermons on cable television substantially pressures him "'to modify his behavior and to violate his beliefs.'" *Couch*, 679 F.3d at 200 (quoting *Lovelace*, 472 F.3d at 187)); *see Coleman*, 413 F. App'x at 875–76. At best, the record indicates that Defendants' lack of provision of NOI programming on cable television prevents Shabazz's study of sermons in his preferred manner. Such a showing fails to establish a substantial burden. *See Van Wyhe*, 581 F.3d 657 (concluding that denying an inmate a tape player in his cell to study Hebrew failed to constitute a substantial burden on the inmate's religious exercise); *Krieger*, 496 F. App'x at 324–25; *Living Water Church of God*, 258 F. App'x at 739.

### E.    Free Exercise

Similar to RLUIPA, in order for Shabazz to survive summary judgment for his First Amendment claim, Shabazz must demonstrate Defendants' conduct substantially burdens his religious exercise. *Whitehouse*, 2011 WL 5843622, at *5. "RLUIPA provides considerably more protection for an inmate's religious exercise than does the Free Exercise Clause of the Constitution of the United States." *Id.* at *5 (citing *Lovelace*, 472 F.3d at 186). Thus, "[w]here an inmate has not put forth sufficient evidence under RLUIPA to demonstrate a substantial burden on his religious exercise, his claim fails under the Free Exercise Clause of the First Amendment as well." *Van Wyhe*, 581 F.3d at 657–58 (citing *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008)). As explained above, Shabazz has failed to demonstrate a

22

substantial burden on his religious exercise with respect to the allegations in Claims Three (b) and Five (b).  Accordingly, Claims Three (b) and Five (b) will be DISMISSED.

In Claim One (a), Shabazz contends that Defendants violated his Free Exercise rights by failing to provide him with a diet that accords with his religious beliefs as outlined in *How to Eat to Live*.  For the reasons stated above in Part III.C.1, the Court declines to address this claim at this juncture.  The Court orders further briefing on this claim as directed previously.[19]

## IV.    EQUAL PROTECTION

The Equal Protection Clause of the Fourteenth Amendment commands that similarly situated persons be treated alike.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).  To survive summary judgment, Shabazz must demonstrate: (1) "that he has been treated differently from others with whom he is similarly situated"; and, (2) that the differing treatment resulted from intentional discrimination. *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).  To succeed on an equal protection claim, a plaintiff must set forth "specific, non-conclusory factual allegations that establish improper motive." *Williams v. Hansen*, 326 F.3d 569, 584 (4th Cir. 2003) (internal quotation marks omitted) (citation omitted).[20]  If a plaintiff satisfies the above, "the court proceeds to

---

[19] Although Defendants assert entitlement to qualified immunity, that assertion largely omits citation to relevant law.  Contrary to Defendants' approach to briefing, "[a] defendant invoking qualified immunity must do more than mention its existence and demand dismissal of the suit." *Fisher v. Neale*, No. 3:10CV486–HEH, 2010 WL 3603495, at *3 (E.D. Va. Sept. 8, 2010).  The defendant must (1) identify the specific right allegedly violated "at the proper level of particularity," *Campbell v. Galloway*, 483 F.3d 258, 271 (4th Cir. 2007); (2) brief, with full supporting authority, why the right was not so clearly established as to put a reasonable official on notice of any legal obligations; and (3) describe with particularity the factual basis supporting the assertion that a reasonable official in the defendant's situation would have believed his conduct was lawful.  *See Collinson v. Gott*, 895 F.2d 994, 998 (4th Cir. 1990)).

[20] No evidence exists that any of Defendants' policies were motivated by an intent or desire to discriminate against Shabazz because he is a member of the Nation of Islam.

determine whether the disparity in treatment can be justified under the requisite level of

scrutiny." *Morrison*, 239 F.3d at 654 (citations omitted). "In a prison context," disparate

treatment passes muster so long as "the disparate treatment is 'reasonably related to [any]

legitimate penological interests.'" *Veney v. Wyche*, 293 F.3d 726, 732 (4th Cir. 2002) (alteration

in original) (quoting *Shaw v. Murphy*, 532 U.S. 223, 225 (2001)).

To evaluate the reasonableness of a prison's policy, courts apply the factors set forth in

*Turner v. Safley*, 482 U.S. 78, 89–92 (1987). *Veney*, 293 F.3d at 732.

> That test asks: (1) whether there is a "valid, rational connection" between the
> prison regulation or action and the interest asserted by the government, or whether
> this interest is "so remote as to render the policy arbitrary or irrational"; (2)
> whether "alternative means of exercising the right . . . remain open to prison
> inmates"; (3) what impact the desired accommodation would have on security
> staff, inmates, and the allocation of prison resources; and (4) whether there exist
> any "obvious, easy alternatives" to the challenged regulation or action.

*Wall v. Wade*, 741 F.3d 492, 499 (4th Cir. 2014) (parallel citation omitted) (quoting *Lovelace*,

472 F.3d at 200). The Court need not "weigh evenly, or even consider explicitly, each of the

four *Turner* factors." *Spies v. Voinovich*, 173 F.3d 398, 403–04 (6th Cir. 1999) (citations

omitted); *see Veney*, 293 F.3d at 732 (finding three factors applicable); *Lambirth v. Cambra*, 177

F. App'x 691, 691–92 (9th Cir. 2006) (finding only the first factor relevant, and explaining that

the inquiry then turns to whether "the inmate severs that common sense connection"). "The

burden, moreover, is not on the State to prove the validity of prison regulations but on the

prisoner to disprove it." *Overton, v. Bazzetta*, 539 U.S. 126, 132 (2003) (citations omitted).

As explained below, Shabazz fails to demonstrate that Defendants violated his equal

protection rights.

24

### A.      Diet (Claim Two)

In Claim Two Shabazz asserts that, Defendants violated his rights to equal protection by "providing religious, medical, dental, and Common Fare diets for other prisoners, while refusing to provide him with a N.O.I. diet." (Compl. 12.)  Shabazz claims that he should be transferred to Buckingham Correctional Center "so he could receive the N.O.I. diet there . . . ." (*Id.*)  Shabazz appears to compare himself to three types of inmates:  (1) inmates in the GCC receiving religious diets; (2) inmates in the Buckingham Correctional Center receiving NOI diets; and (3) inmates receiving medical and dental diets.

#### 1.      Other GCC Inmates

In the VDOC, inmates who have special religious dietary needs receive the Common Fare diet. (Engelke Aff. Encl. A, at V.A.)  Thus, the VDOC treats Shabazz the same as inmates of the same and different religions who require special religious diets.  Shabazz shows no differential treatment of inmates receiving religious diets in the GCC, thus, he demonstrates no equal protection violation on this ground.

#### 2.      Buckingham Correctional Center Inmates

Shabazz's equal protection argument regarding inmates who receive a NOI diet in Buckingham Correctional Center is difficult to decipher and logically inconsistent.  Shabazz argues that he wants to receive the diet that certain NOI inmates receive at Buckingham, but then also inconsistently states that he does not actually want this diet because he is vegetarian and wants to only eat once a day.  Thus, Shabazz actually desires special individual treatment, not to be treated like everyone else.

Shabazz first fails to demonstrate that he is similarly situated to the NOI inmates in Buckingham.  The NOI diet at Buckingham Correctional Center includes fish and provides three

25

meals a day. (Engelke Aff. Encl. B.)[21] Shabazz wants a diet that has no fish and provides only one meal a day; thus, it is unclear why he believes these inmates are similar to him. (Compl. ¶ 18.) Moreover, Buckingham is not a Common Fare facility. (Engelke Aff. ¶ 6.) Instead, certain inmates at Buckingham receive a special diet pursuant to an old court order, predating the Common Fare diet, and the inmates are merely grandfathered in to the old diet. (*Id.*) Shabazz fails to demonstrate that as a vegetarian, he is similarly situated to the NOI inmates who eat fish at Buckingham Correctional Center. Shabazz also fails to demonstrate he is similarly situated to inmates who receive a special diet based on a court order that pre-dates the Common Fare diet. Because Shabazz fails to demonstrate that he is similarly situated to inmates in Buckingham, this alone forecloses Shabazz's equal protection claim.

Even if Shabazz could demonstrate that he and a comparator inmate at Buckingham Correctional Center were similarly situated, and that the different treatment was a result of intentional discrimination, his claim nonetheless fails. Defendants have proffered sufficient evidence demonstrating that any differential treatment "is reasonably related to . . . legitimate penological interests," *Veney*, 293 F.3d at 732 (internal quotation marks omitted) (citation omitted), that provision of individually tailored diets would be unduly burdensome, *id.*, and no reasonable alternatives exist. *Id.*

The NOI diet at Buckingham Correctional Center predated the Common Fare diet and was provided in response to a court order. (Engelke Aff. ¶ 6.) A few offenders remain on the diet because they were grandfathered in and continue to receive that diet. (*Id.*) The diet is costly compared to the Common Fare diet, double the price of the Common Fare diet, and provided by

---

[21] In his unsworn Response, Shabazz argues that "Defendants have obviously altered the original food list on the menu for members of Nation of Islam at Buckingham Correctional Center." (Resp. 4.) Shabazz offers no admissible evidence to support this conclusion and he provides no facts indicating that this conclusion is based on his personal knowledge.

an outside vendor. (*Id.*) The Common Fare diet was designed to accommodate a variety of religious dietary restrictions and provision of individually tailored diets is not feasible for efficient operations. (*See id.* ¶¶ 4–5, 10.) The Common Fare diet must be premade, covered and maintained at a certain temperature due to strict preparation restrictions, and therefore it is not feasible to select alternative menu items. (*Id.* ¶ 9.) Shabazz may purchase approved food items from the commissary to supplement his meal. (*Id.*)

Defendants have demonstrated that the refusal to provide Shabazz with the diet provided to NOI inmates housed at Buckingham Correctional Center, to the extent Shabazz even desires that diet, is reasonably related to the legitimate penological interests of containing cost, managing scarce prison resources, and efficient food provision. *Cf. Baranowski v. Hart*, 486 F.3d 112, 122 (5th Cir. 2007) (no equal protection or First Amendment violation because denying inmate Kosher diet reasonably related to the legitimate penological interest of containing cost and running a simplified food program); *DeHart v. Horn*, 390 F.3d 262, 272 (3d Cir. 2004) (denying inmate Buddhist diet was reasonably related to the prison's legitimate penological interest in efficient food provision); *Williams v. Morton*, 343 F.3d 212, 217–18 (3d Cir. 2003) (denying inmate Halal meat was reasonably related to the legitimate penological interests of simplified food service, security, and cost control); *Cooper v. Lanham*, No. 97–7183, 1998 WL 230913, at *1–2 (4th Cir. May 7, 1998) (holding that a prison's denial of Kosher meals was reasonably related to the legitimate penological interest of conserving and managing prison resources). Shabazz fails to proffer any evidence demonstrating that this penological interest is "so remote as to render the policy arbitrary or irrational." *Wall*, 741 F.3d at 499 (citation omitted) (internal quotations marks omitted). Shabazz fails to establish that Defendants' failure

to provide him with the NOI diet at Buckingham Correctional Center violates his right to equal protection.

### 3.   Medical and Dental Diets

Shabazz also claims that inmates receive special medical and dental diets.  Shabazz again fails to demonstrate that as an inmate seeking a religious diet he is similarly situated to inmates who require certain diets for medical conditions.  "[T]he Constitution does not require 'things which are different in fact or opinion to be treated in law as though they were the same.'"  *O'Bar v. Pinion*, 953 F.2d 74, 81 (4th Cir. 1991) (quoting *Tigner v. Texas*, 310 U.S. 141, 147 (1940)); *see Brown v. Mathena*, No. 7:14–cv–00020, 2014 WL 4656378, at *3 (W.D. Va. Sept. 16, 2014) (explaining that the NOI Plaintiff is "'in all relevant respects alike' and similarly situated to inmates receiving Common Fare, not the other menus, and Plaintiff fails to establish an equal protection claim").

Because Shabazz establishes no equal protection violation, Claim Two will be DISMISSED.

### B.   Worship Services (Claim Four)

In Claim Four, Shabazz contends that Defendants violated "his right to equal protection of the law by providing other prisoners sufficient time for worship services while denying him sufficient time for worship services." (Compl. 13.)  Shabazz argues that Defendants:

> Authorize prisoners of the Protestant Faith at [GCC] to participate in congregate worship from 6:30 p.m. til 8:30 p.m. on Sundays and in Bible Study from 6:30 p.m. til 8:30 p.m. on Thursdays. (See Exhibit: D). They also authorized the Hispanic Prisoners who participate in these services to participate in Spanish Language Bible Study from 6:30 p.m. til 8:30 p.m. on Thursday. *Id.* Defendant authorized prisoners who practice Catholicism at [GCC] to participate in religious services from 9:30 a.m. til 11:00 a.m. on Mondays and from 8:30 a.m. til 10:30 a.m. on Thursdays. *Id.*

(Compl. ¶ 43.) From this, Shabazz concludes that "[p]risoners of the Christian Faith, are authorized to participate in Religious Services over the so-called allotted [two] hours the N.O.I. has." (*Id.* ¶ 41 (citation omitted).)[22] Shabazz also claims that other religions are permitted to participate in special religious events. (*Id.* ¶ 44.) Shabazz fails to demonstrate that similarly situated inmates are treated differently.

First, contrary to Shabazz's assertion, the record demonstrates that all Christian denominations and the other religious denominations specified, including both NOI and Muslim sects, have two hours scheduled for a group religious service each week. (Compl. Ex. D, at 1.)[23] In addition, Protestant inmates are permitted to have two hours of Bible study split between Spanish and English speaking inmates. (*Id.*) Similarly, Shabazz and Smith aver that NOI inmates engage in group worship, religious classes, and religious study groups in their assigned cluster and both Shabazz and Smith have served as the Student Minister. (Shabazz Decl. ¶¶ 3–4; Smith Aff. ¶ 31.) Shabazz also claims that he *currently* conducts religious classes, study groups, and group worship for NOI inmates. (Resp. 7.) Moreover, despite his contention that other religions are permitted to participate in special religious events, NOI inmates are also allowed to participate in NOI holidays that other religions do not participate in. Thus, the Court fails to discern any differential treatment by the Defendants.[24]

---

[22] In his affidavit Shabazz states that he intended to state two hours of service, not eight as he states in his Complaint. (Resp. 6.)

[23] Shabazz conflates religions with denominations in his attempt to demonstrate differential treatment of Christian inmates. Shabazz combines the times allotted for Catholic and Protestant services although Catholic and Protestant inmates would attend different services. Under Shabazz's argument, the GCC offers four hours of Islamic religious services because it offers separate NOI and Orthodox Muslim services.

[24] Johnathan Lee X Smith, a non-party to the action, avers that NOI services are often delayed due to head count or late service of lunch, and that Smith has asked them to change the time but VDOC employees refuse to do so. (*See* Smith Aff. ¶¶ 28–29.) Shabazz, however, fails

In addition, "'the Fourteenth Amendment does not demand that every religious sect or group within a prison—however few in numbers—must have identical facilities or personnel.'" *Baranowski*, 486 F.3d at 123 (quoting *Freeman v. Tex. Dep't of Crim. Justice*, 369 F.3d 854, 862–63 (5th Cir. 2004)). Instead, "prison officials must afford prisoners 'reasonable opportunities . . . to exercise the religious freedom guaranteed by the First and Fourteenth Amendment[s].'" *Id.* (alteration in original) (quoting *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972)). Shabazz offers no evidence that similarly situated faiths are afforded superior treatment, or that the GCC's policies are a product of purposeful discrimination. While not well-articulated, the Court infers that Shabazz argues that other religious groups have more congregational worship time scheduled in the chapel than NOI inmates. However,"[a] . . . place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand." *Id.* (quoting *Cruz*, 405 U.S. at 322 n.2).

The record demonstrates that the GCC attempted to secure volunteers from the NOI leadership to conduct services. (Beighley Aff. ¶ 5.) Only one NOI leader in the state has offered his services to GCC and he splits his time amongst all VDOC facilities. (*Id.*) Defendants have sought volunteers to conduct services beyond the two-hour Friday services, however, no NOI leaders have volunteered. (*Id.*) Additionally, the amount of hours and space allocated to various religious groups is based on the number of offenders participating in the program and the availability of volunteer and staff resources. *See Baranowski*, 486 F.3d at 123 (holding that Defendants may "consider the demand and need of the group requesting the chapel, along with space and staffing limitations, when deciding where religious groups will conduct their

---

to raise this claim in his Complaint. If Smith wishes to raise this claim himself, he may do so by filing his own complaint.

services"); *Thompson v. Com. of Ky.*, 712 F.2d 1078, 1080 (6th Cir. 1983) (finding no equal

protection violation when "the allocation of chapel time and funds for religious activities . . .

reflected the different numbers of Christians and Muslims who use the chapel"). Thus,

Defendants have proffered that any purported differential treatment is not the result of purposeful

discrimination but due to limited prison resources, the lack of volunteers, and the size of the

religious group.

    Even if the Court found that Shabazz had made the threshold showing that similarly

situated inmates are treated differently and the differential treatment was the result of intentional

discrimination, his claim fails. Defendants have proffered evidence that any differential

treatment is reasonably related to the legitimate penological interests in managing limited prison

resources. (*See* Robinson Aff. ¶ 4; Mem. Supp. Mot. Summ. J. 14); *Freeman*, 369 F.3d at 861

(finding that "staff and space limitations, as well as financial burdens, are valid penological

interests"); *cf. Smith v. Kyler*, 295 F. App'x 479, 481–82 (3d Cir. 2008) (citation omitted) (citing

cases for the proposition that "managing limited financial resources" provide a rational basis for

policy of providing chaplains based on number of inmates who attended services). Accordingly,

Claim Four will be DISMISSED.

    **C.**    **Bowties (Claim Six)**

    In Claim Six, Shabazz argues that Defendants violated his "right to equal protection of

the law by refusing to allow him to purchase and wear bow ties, while allowing other prisoners

to wear" certain items of religious clothing. (Compl. 14.) Specifically, Shabazz alleges that

"[t]he VDOC authorize[s] its prisoners to purchase and wear Yarmulkes, Tallitts, Colorful

KufiCaps, Red Fezes with dangling black tassels . . . ." (Compl. ¶ 51.) Shabazz also argues that

civilian inmates are allowed to wear many different items of clothing, but the VDOC denies

Shabazz the right to "purchase and wear bowties generally. He cannot purchase and wear bowties only during his religious services." (*Id.*) Specifically, Shabazz seeks the ability to wear "clip-on bow ties and/or clip on neckties" to religious services. (*Id.* ¶ 47.)

Shabazz puts forth no evidence that any inmate, for religious or secular reasons, has been permitted to purchase and wear a tie or bow tie. Instead, the record conclusively demonstrates that no inmate in the GCC is permitted to purchase or wear a bow tie. Therefore, the VDOC treats Shabazz the same as other inmates who desire to wear a tie. Once again, Shabazz desires special individual treatment, not to be treated like other offenders in the VDOC. Shabazz fails to demonstrate that similarly situated inmates are treated differently and he fails to proffer facts indicating that Defendants violated his right to equal protection.

To the extent Shabazz argues that inmates of other religions are allowed to wear certain religious clothing to religious services, he fails to demonstrate how these inmates are similarly situated to him. None of the clothing items Shabazz identifies are neck gear, and none contain metal, an identified security concern. Thus, Shabazz fails to demonstrate how inmates using these items are similarly situated to him. *See Harvey v. Town of Merriville*, 649 F.3d 526, 532 (7th Cir. 2011) ("Without a similarly situated comparator the [plaintiffs'] equal protection claim cannot hold water."); *O'Bar*, 953, F.2d at 81.[25] Accordingly, Claim Six will be DISMISSED.

---

[25] Even if Shabazz had demonstrated that he and comparator inmate were treated differently and the differential treatment was the result of purposeful discrimination, Shabazz fails to demonstrate that the Defendants' decision to ban bowties due to security concerns is not reasonably related to a legitimate penological objective. *Cf. Abdul-Aziz v. Ricci*, 569 F. App'x 62, 66 (alteration in original) (3d Cir. 2014) ("[A]n inmate 'cannot obtain relief if the difference between the defendants' treatment of him and their treatment of [inmates of another religion] is 'reasonably related to legitimate penological interests.'" (quoting *DeHart v. Horn*, 227 F.3d 47, 61 (3d Cir. 2000))). Defendants explain clip-on bow ties contain metal that can be fashioned into a weapon. (Robinson Aff. ¶ 7.) Thus, the prison policy banning bow ties is reasonably related to the legitimate interests of prison safety and security. *See Veney*, 293 F.3d at 726 (citation omitted) (explaining that "[p]rison safety and security are legitimate penological interests").

### D.     Religious Television Programming (Seven (a))

In Claim Seven (a) Shabazz argues that Defendants violated his "right to equal protection of the law by providing Christian and Jewish prisoners access to Christian and Jewish programs via cable television and denying him access to N.O.I. programs via cable television." (Compl. 15.)  Shabazz claims that the Christian and Jewish "programs are aired twenty-four (24) hours daily."  (*Id.* ¶ 56.)

Shabazz fails to demonstrate that any differential treatment of NOI inmates and Christian and Jewish inmates was the result of Defendants' intentional discrimination.  Defendants proffer evidence that a contract cable company provides television programming to the GCC.  Shabazz fails to offer competent evidence that Defendants had the ability to secure a cable provider that offered NOI programming and failed to do so.[26]  Shabazz therefore demonstrates no purposeful discrimination by Defendants.

To the extent Shabazz alleges that inmates in the pod watch Christian and Jewish programs twenty-four hours a day, and he desires to watch NOI programming instead, Defendants explain that the televisions in the pod area are tuned to whatever channel the majority of the inmates decide to watch.  (Everette Aff. ¶ 4.)  Shabazz fails to establish that Defendants personally treated similarly situated inmates differently than him, or that the differential treatment was the result of intentional discrimination.  Accordingly, Claim Seven (a) will be DISMISSED.

---

[26] As previously explained, Shabazz claims "Minister Farrahkan's daily and weekly sermons and Nation of Islam programs are aired via cable television."  (Shabazz Decl. ¶ 15.)  He also states: "If Defendants' current cable contractor is unwilling to air Minister Farrahkan's sermons and the programs of the Nation of Islam . . . Defendants should hire a new contractor." (Resp. 11.)  Shabazz fails to provide any facts indicating that he has personal knowledge about whether Minister Farrahkan's daily and weekly sermons or NOI programs are aired on cable television or whether Defendants have the ability to obtain a contractor that provides such programming.  *See* Fed. R. Civ. P. 56(c)(4).

## V. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (ECF No. 39) will be GRANTED with respect to Claims Two, Three (a) and (b), Four, Five (a) and (b), Six, and Seven (a) and (b) and will be DENIED WITHOUT PREJUDICE as to Claims One (a) and (b).  Defendants Johnson, Clarke, Jabe, G. Robinson, A. David Robinson, Cei, Shear, Engelke, Hinkle, Wright, Everett, Beighley, Andersen, and Puryear are DISMISSED as parties to the action.  Shabazz's claims for money damages under RLUIPA against the remaining Defendants will be DISMISSED.  The remaining Defendants will be DIRECTED to file a renewed motion for summary judgment within twenty (20) days of entry hereof.  Shabazz is ADVISED that he may respond to Defendants submissions within forty-one (41) of the date of entry hereof.

An appropriate Order shall accompany this Memorandum Opinion.

Date: 2- 24-15
Richmond, Virginia

/s/
_____
James R. Spencer
Senior U. S. District Judge