

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**MUWAKKIL S.B. SHABAZZ,**

    Plaintiff,

v.                                        Civil Action No. **3:12CV282**

**GENE M. JOHNSON, et al.,**

    Defendants.

### MEMORANDUM OPINION

Muwakkil S.B. Shabazz, a Virginia inmate and a member of the Nation of Islam ("NOI"), brings this 42 U.S.C. § 1983[1] action alleging that Defendants[2] violated his First Amendment[3]

---

[1] That statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

[2] By Memorandum Opinion and Order entered February 24, 2015, the Court dismissed all claims except Claim One (a) and (b), and all Defendants except Wendy S. Hobbs, Regional Administrator of the Virginia Department of Corrections ("VDOC"), V.M. Washington, former warden at Greensville Correctional Center ("GCC"), and Ralph Abernathy, former food service manager at the GCC. The Court ordered the remaining Defendants to file a renewed Motion for Summary Judgment with respect to Claims One (a) and (b). The Court also dismissed Shabazz's demands for monetary damages with respect to his RLUIPA claim. By Memorandum Opinion and Order entered June 9, 2015, the Court dismissed Defendant Abernathy as a party to the action because Shabazz failed to effectuate timely service on him.

[3] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. amend. I.

rights and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").[4]  The action

proceeds on Claims One (a) and (b) of Shabazz's Particularized Complaint.  ("Complaint," ECF

No. 29.)  Specifically, Shabazz asserts:[5]

> Claim One:   By refusing to provide Shabazz with a diet in conformity with his religious
> beliefs, Defendants violated (a) the First Amendment and (b) RLUIPA.

(*See* Compl. 11.)  Shabazz seeks declaratory, injunctive, and monetary relief.  Defendants have

filed a renewed Motion for Summary Judgment.[6]  Shabazz has responded.  For the reasons set

forth below, the Court will GRANT Defendants' Motion for Summary Judgment.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  The party seeking summary judgment bears the responsibility to inform the

court of the basis for the motion, and to identify the parts of the record which demonstrate the

absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive

issue, a summary judgment motion may properly be made in reliance solely on the pleadings,

depositions, answers to interrogatories, and admissions on file."  *Id.* at 324 (internal quotation

marks omitted).  When the motion is properly supported, the nonmoving party must go beyond

the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and

---

[4] Religious Land Use and Institutionalized Persons Act ("RLUIPA") of 2000, 42 U.S.C. §§ 2000cc *et seq.*

[5] The Court corrects the capitalization and punctuation and removes emphasis from Shabazz's submissions.

[6] As explained in the Court's May 14, 2015 Memorandum Order, the Court construes the "MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM" (ECF No. 60) as a renewed Motion for Summary Judgment.  (*See* ECF No. 64, at 1.)

admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)).

In reviewing a summary judgment motion, the court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere scintilla of evidence will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (citation omitted). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the *onus* of proof is imposed." *Id.* (internal quotation marks omitted) (citation omitted). Additionally, "'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'" *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

As pertinent here, in support of their Motion for Summary Judgment, Defendants rely upon: (1) an affidavit of Elisabeth M. Thornton, the VDOC Operations Manager (Mem. Supp. Mot. Summ. J. Ex. A, ECF No. 61–1 ("Thornton Aff.")); (2) Shabazz's commissary records (*id.* Encl. A); (3) an affidavit of K. Whitehead, the Grievance Coordinator (Mem. Supp. Mot. Summ. J. Ex. B, ECF No. 61–2 ("Whitehead Aff.")); (4) VDOC Operating Procedure § 866.1 (*id.* Encl. A & B); and, (5) Shabazz's grievance material (*id.* Encl. C).

In response, Shabazz submits: (1) his own affidavit (Resp. Mot. Summ. J. Attach 1, ECF No. 65–1 ("Shabazz Aff.")); and (2) an affidavit of Johnathan Lee X Smith, a frequent litigant in

the Court (*id.* Attach 2, ECF No. 65–2 ("Smith Aff. II")). Additionally, Shabazz swore under penalty of perjury to the truth of his statements in his Complaint.

Moreover, in order to present a complete picture of the surrounding facts, the Court relies on previously submitted evidence. This includes several affidavits submitted in support of Defendants' first Motion for Summary Judgment (*see* Mem. Supp. First Mot. Summ. J., ECF No.40), including: (1) an affidavit of Mark Engelke (*id.* Attach. 3, ECF No. 40–3 ("Engelke Aff.")); (2) the VDOC Food Service Manual (Engelke Aff. Encl. A); and, (3) a copy of the Common Fare Agreement signed by Shabazz (Engelke Aff. Encl. C). The Court also relies on the previously filed declaration of Shabazz (Resp. First Mot. Summ. J. Attach. 1, ECF No. 46–1 ("Shabazz Decl.")), and the affidavit of Johnathan Lee X Smith (*id.* Attach. 2, ECF No. 46–2 ("Smith Aff.")).

In light of foregoing submissions and principles, the following facts are established with respect to the Motion for Summary Judgment.

## II.   SUMMARY OF PERTINENT FACTS[7]

### A.   Common Fare Diet

The VDOC recognizes twenty-eight different religions. (Thornton Aff. ¶ 4.) Many of these religions have dietary restrictions. (*Id.*) Differences in opinion exist about these dietary restrictions even within a given religion. (*Id.*) The "restrictions include not only the types of food (e.g. no pork products), the way meat is slaughtered (e.g. halal meat), the way food is stored and cooked (e.g. kosher), how the cooking tools are cleaned (e.g. kosher), and how the food is

---

[7] In his Response to the renewed Motion for Summary Judgment, Shabazz does not dispute any of the facts pertaining to the merits of his First Amendment and RLUIPA claim. Instead, in his "FACTS IN DISPUTE" section, he only disputes the fact that he failed to exhaust his administrative remedies. (*See* Resp. Mot Summ. J. 1–2.)

served (e.g. on trays uncontaminated by non-kosher food)." (*Id.*) Religious diets also may require fasting or feasts during various holidays. (*Id.*)

"The Common Fare diet was designed specifically to meet the dietary needs of offenders who, for religious reasons, require a Kosher non-pork diet and whose dietary requirements cannot be accommodated with foods provided" by the regular menu ("Master Menu"). (Engelke Aff. ¶ 4.) The Common Fare diet was "designed to meet all known religious dietary restrictions." (Thornton Aff. ¶ 6.) All foods purchased and used for the Common Fare diet, save fruits and vegetables, are consistent with certified "kosher" standards. (*Id.*) The storage, preparation, and serving of food, and the cleaning of the kitchen and trays complies with all halal and kosher requirements. (*Id.*) "Appropriate procedures are in place to ensure that food service workers . . . receive appropriate training and supervision in the proper handling of Common Fare food." (Engelke Aff. ¶ 4.) "The Common Fare menu has been analyzed and certified as meeting or exceeding minimum daily nutritional requirements." (*Id.* ¶ 5.) The Islamic leader of the Islamic Center for Virginia has affirmed that the Common Fare diet meets Islamic guidelines. (*Id.*) Those offenders on the Common Fare diet who sign up as Islamic offenders are also allowed to participate in religious observances such as Ramadan and NOI Month of Fasting. (*Id.*)

Currently 3,000 offenders participate in the Common Fare diet. (*Id.* ¶ 7; Thornton Aff. ¶ 10.) "All offenders approved for the Common Fare diet are required to sign a Common Fare Agreement." (Engelke Aff. ¶ 7.) Shabazz signed his agreement on August 6, 2012. (*Id.*) "By signing this agreement, Shabazz acknowledged that the Common Fare provides him with an

appropriate religious diet that meets or exceeds daily nutritional requirements." (*Id.* ¶ 7; *id.* Encl. C.)[8]

VDOC food service provides inmates who eat from the regular serving line with a meat alternative at each meal. (*Id.* ¶ 8.) Offenders who do not eat meat may select the alternative at each meal. (*Id.*) Beans are offered for lunch and dinner meals. (*Id.*) When the breakfast meal contains meat, cheese or peanut butter is offered as an alternative. (*Id.*) "Because the regular menu includes legumes, dairy products and eggs, inmates who choose not to eat meat nevertheless receive adequate nutrients necessary to a healthy diet." (*Id.*)

The Common Fare diet is not served cafeteria-style like the regular meal. (*Id.* ¶ 9.) "The Common Fare trays must be pre-made, covered and maintained at a specific temperature." (*Id.*) For this reason, offenders who participate in the Common Fare diet are unable to select alternative menu items from the Common Fare menu. (*Id.*) Offenders may purchase approved food items such as peanut butter from the commissary. (*Id.*) The "planned Common Fare menu may not be changed at the facility level, except where seasonal availability of produce items warrant substitutions be made." (*Id.* Encl. A, "Food Service Manual," at V.C.)

### B.   Shabazz's Dietary Demands

Shabazz is a member of the NOI. (Shabazz Decl. ¶ 3.) He currently participates in the Common Fare diet. (Compl. ¶ 18.) Shabazz's religious tenets require him to consume a vegetarian diet. (*Id.*) Shabazz claims he is a "strict vegetarian for religious and health reasons. I eat no meat or marine life. For religious reasons, I desire an annual diet free of all meat, all marine life, and all dairy products." (Shabazz Decl. ¶ 13.) Shabazz met with Defendant Abernathy to explain that the Common Fare diet "does not accommodate his Religious Dietary

---

[8] On the signed form, Shabazz wrote: "I am signing this under duress, that I will be removed off the diet if I don't!" (Engelke Aff. Encl. C (capitalization corrected).)

Tenets that [are] outlined in *How to Eat to Live*, by the Most Honorable Elijah Muhammad,
Volumes I and II." (Compl. ¶ 18.)  Shabazz filed an informal complaint, regular grievance, and
two appeals regarding his desire to have a diet in accord with *How to Eat to Live*, and
Defendants Abernathy, Washington, and Hobbs informed him that the Common Fare diet met
his religious dietary needs.  (*See id.* ¶¶ 19–23 (citing Ex. A, at 1–7).)  Shabazz states that "his
dietary tenets, require him to train himself to eat only one (1) meal every twenty-four hours, with
no in between snacks." (*Id.* ¶ 18.)  According to Shabazz, he "has lost about 20 lbs. of his bodily
weight" from prison officials' refusal to provide him with an NOI diet.  (*Id.* ¶ 30.)  Shabazz
states that both the Master Menu and the Common Fare diet "violate[ ] my religious dietary
requirements," so he "opted for the Common Fare because it is the lesser of two evils."
(Shabazz Decl. ¶ 7.)

According to Johnathan Lee X Smith, *How to Eat to Live* requires NOI believers to
"'eventually wean'" themselves off meat and marine life.  (Smith Aff. ¶ 14.)  Smith explains that
in 1998, the Honorable Louis Farrakan ordered all NOI members to stop eating meat and all
marine life.  (*Id.* ¶ 15.)  Smith explains that:

> 18.  *How to Eat to Live* expressly says that the annual diet of members of
> the Nation of Islam is to consist[ ] of fresh, cooked spinach, cauliflower, rhubarb,
> eggplant, red cabbage, broccoli, white cabbage, okra, carrot, navy (pea) beans,
> asparagus, brussel sprout[s], turnip root, browned rice, white corn in its milk
> stage, and whole wheat bread that has been slowly baked twice and then allowed
> to set for 2-3 days before eaten.  It requires us to eat fresh fruit and to drink
> bottled fruit juices.  It says that our food must be prepared and cooked in the
> manner prescribed by God through the most Honorable Elijah Muhammad in
> *How to Eat to Live*.  Our drinking water must be boiled and strained with cheese
> before we drink it.
> 19.  *How to Eat to Live* expressly forbids members of the Nation of Islam
> to use . . . utensils that have been used to prepare, cook, bake, or eat pork, it's by
> products, and other religiously unacceptable food.
> 20.  *How to Eat to Live* expressly forbids members of the Nation of Islam
> pork and its by products, canned food, white flour, white bread, freshly baked
> bread, freshly baked pastry, white potatoes, sweet potatoes, pancakes, french

toast, syrup, margarine, macaroni, spaghetti, kidney beans, pinto beans, black-eyed peas, fried food, white rice, processed food[s], corn bread, peanut butter, scrambled eggs, dry cereal, wet cereal, stir fried vegetables, collard greens, kale salad, soy bean[s], jelly, baked beans, artificial food.

21. *How to Eat to Live* expressly forbids members of the Nation of Islam to eat food that has been prepared and cooked by disbelievers or unbelievers in our Islamic faith.

22. . . . [T]he food[s] served from the Master Menu are expressly forbidden to us by *How to Eat to Live*. . . . The <u>current</u> Master Menu contains these and additional foods, such as crab meat, oysters. In addition, this food is prepared, cooked, baked, and eaten in the precise manner condemned by *How to Eat to Live*.

. . . .

24. The annual Common Fare menu consists of fresh fruit, dry cereals, white bread, margarine, coffee, milk, jelly, peanut butter, hard boiled egg mayonnaise, cottage cheese, canned vegetarian beans, beverage[s], pickle radish, tuna fish, beet particles, white rice, chicken particles, <u>raw</u> bell peppers, lettuce, cucumber, cauliflower, spinach, celery sticks, carrot sticks, onion, white cabbage, zucchini, tomato[ ], and broccoli . . . .

25. *How to Eat to Live* forbids members of the Nation of Islam, including Plaintiff, Shabazz, to eat a diet that consists primarily of uncooked vegetables, such as the Common Fare Menu, because of the many poisonous chemicals sprayed on the vegetables . . . and because the human digestive tract was not designed by its Creator to digest raw vegetables.

(*Id.* ¶¶ 18–22, 24–25.) According to Smith, the Master Menu and Common Fare diet are

unacceptable to members of the NOI under *How to Eat to Live*. (*Id.* ¶¶ 22–23.) In Smith's most

recent affidavit, in a somewhat contrary stance, he swears that he "did **not** mean to suggest that I

believe the prison officials have a legal obligation to accommodate our dietary needs to the full

extent mandated by our dietary tenets."[9] (Smith Aff. II ¶ 3.)

---

[9] Smith avers:

When I explained the dietary tenets of the Nation of Islam in my previous Affidavit or Declaration, I did **not** mean to suggest that I believe that the prison officials have a legal obligation to accommodate our dietary needs to the full extent mandated by our dietary tenets. The explanation that I gave was designed and intended to help this Court understand our dietary requirements because they did not appear in Shabazz's Complaint.

We would **not** expect the prison officials to serve us fresh, cooked vegetables instead of canned vegetables if the officials were ordered by this Court

### C.    Feasibility of Shabazz's Dietary Demands

The Master Menu and Common Fare menu range from 2700 to over 3000 calories per day over the course of three meals. (Thorton Aff. ¶ 8.) It is not feasible to offer Shabazz one meal per day. (*Id.*) Based on Shabazz's stated food restrictions, his diet would be comprised of mostly vegetables and to reach the average daily caloric value of 2700 to 3000 calories, the portion size for one meal would be very large. (*Id.*) Inmates are provided approximately twenty minutes to consume meals, and it would be difficult for a meal of this volume to be consumed during the allotted time. (*Id.*) Inmates are not permitted to carry food from the dining hall to their cells. (*Id.*)[10] Moreover, the food restrictions outlined by Mr. Smith "are cost prohibitive and extremely difficult to institute in a prison setting." (*Id.* ¶ 9.) Items such as peanut butter, beans, eggs, and cereals are served as part of the Common Fare diet and are valuable sources of

---

to reasonably accommodate our dietary needs. . . . We would be willing to accept cooked, canned vegetables so long as they are acceptable by our dietary tenets.

(Smith Aff. II ¶¶ 3–4.) From Smith's submissions in this case, it is apparent to the Court that Smith is the primary driving force in this litigation. In his affidavits filed in response to Defendants' two summary judgment motions, Smith consistently expands Shabazz's arguments and provides his own testimony to make up for shortfalls in Shabazz's testimony, despite Shabazz's insistence that he too requires a NOI diet. The Court fails to discern why, as an adherent to NOI principles, Shabazz failed to plead the specifics of his dietary tenets in his own affidavits. Moreover, as later discussed, the evidence demonstrates that Shabazz himself fails to eat a diet that comports with NOI restrictions in his personal food choices. (*See infra* Part II.D.)

[10] Ms. Thornton also avers that she spoke to a dietician who explained that "[a]ttempting to absorb total daily calories, vitamins and minerals in one meal would place an individual at risk for digestive issues, high blood pressure and high blood glucose levels. Consuming a high volume of food at one meal without snacks disturbs the body's normal absorption function" and "Shabazz would not be able to get all of the necessary nutrients." (Thornton Aff. ¶ 8.) Shabazz "objects" to this portion of Ms. Thornton's testimony claiming "that she is speculating, offering inadmissible hearsay testimony, and offering nutritional and medical testimony for which she has no had no formal training . . . ." (Shabazz Aff. ¶ 5.)

9

necessary nutrients. (*Id.*) "Additional special preparation and handling of food and beverage would also require more staffing, equipment and storage." (*Id.*)

Attempts to accommodate each variant of religious diets would present significant operational issues and "would be absolutely cost and labor prohibitive." (*Id.* ¶ 5; *see id.* ¶ 7.) For example,

> It would require extensive administrative costs to track which offender was to receive a particular diet at which time. It would require new physical plant construction to have sufficient food storage and preparation areas to keep separate the food and utensils. It would require additional cooking equipment for each religious preference. Additionally, the costs of purchasing the food for each of the religious variants would substantially increase since the foods could not be ordered in bulk.

(*Id.* ¶ 5.) Provision of individualized religious diets would also result in "longer dining hall times for offenders, longer work hours for staff and inmate workers, the need to hire more staff, more offender movement within the institution for meals," and, an increase in inmate kitchen workers and in offender movement for meals would necessitate an "increase in security staff to ensure security in the kitchen work areas and to monitor offenders in the dining hall and throughout the institution during movement." (*Id.* ¶ 7.) Additionally, "[i]ncreases in inmate movement always increases security concerns even with more staffing." (*Id.*)

Because 3000 offenders participate in the Common Fare diet, food is purchased and cooked in volume. (*Id.* ¶ 10.) Many fruits and vegetables served in the institutions are purchased based on seasonal availability. (*Id.*) Shabazz's request for a vegetarian diet is easily accommodated by personal choices from the Common Fare tray by not eating the fish, and he

can choose from the meal options available to him to eat once daily. (*Id.*; *id.* ¶ 13.)[11] The

Common Fare diet is a cold meal. (*Id.* ¶ 11.) According to Smith, *How to Eat to Live* requires

specific vegetables such as spinach, cauliflower, rhubarb, red cabbage, brussel sprouts to be fresh

and served cooked. (*Id.*) "Many of these vegetables are not readily available to the institution

year round and if they were purchased in bulk much would be wasted because many offenders

would not eat them." (*Id.*) The VDOC attempts to provide fresh fruits and vegetables, however,

fresh produce has a limited shelf life. (*Id.*)[12]

### D. Institutional Records Documenting Shabazz's Food Consumption

Although Shabazz insists that he desires to eat a diet consistent with his religious tenets

as outlined in *How to Eat to Live*, institutional records demonstrate that Shabazz fails to follow

these dietary restrictions. According, to Smith, *How to Eat to Live* forbids followers to eat

processed or artificial foods, pork, or pork by-products. Shabazz's commissary purchases from

October 2014 through January 2015, demonstrate that he purchased processed and artificial

foods including "jalapeno cheese spread, flour tortillas, potato chips, sour cream and onion

potato chips, . . . tortilla chips, Texas beef ramen soup, chili ramen soup and iced oatmeal

---

[11] Shabazz seemingly agrees, and states:

> The prison officials have no control over whether I consume one, two, or
> three meals daily. They can compose for me a Nation of Islam diet consisting of
> three nutritionally balanced meals daily and make them available for me. But
> whether I eat one, two, or three meals daily is really none of their business. If I
> do not eat all three meals, I would not be in violation of any prison rule.

(Shabazz Aff. ¶ 12.)

[12] Shabazz also objects generally to Ms. Thornton's testimony about the costs and
administrative burdens associated with the provision of individualized religious diets. As
Operations Manager for the VDOC, Ms. Thornton is competent to testify to these matters.

cookies." (*Id.* ¶ 12; *see id.* Encl. A, at 1–3.)  Additionally, "[m]any of these items contain dairy

and pork derivatives." (*Id.* ¶ 12.)[13]

Shabazz's institutional grievances also demonstrate consumption of a diet inconsistent

with his claimed religious tenets that prohibit him from eating fish, dairy, or uncooked

vegetables.  For example, Shabazz complained that he failed to receive a large enough portion of

mackerel (Whitehead Aff. Encl. C, at 34, ECF No. 61–2),[14] and failed to receive a large enough

portion of unbreaded fish (*id.* at 38).  Shabazz also complained about the quantity of milk he

received and that he desired "to receive what the Common Fare menu states" (*id.* at 42;

Whitehead Aff. Encl. C, at 3, ECF No. 61–3), and that he was "denied a Savior's Meal, which

included fish, fried rice . . . toasted bread, salad and dressing, bean pie . . . (*id.* at 7, ECF No. 61–

3).  On another day, in contrast to his above complaints, Shabazz complained about receiving

fish and stated: "I am a Vegetarian.  I do not eat any flesh, including fish." (*Id.* at 31.)

### III.   RLUIPA AND FREE EXERCISE CLAIMS

#### A.   RLUIPA

RLUIPA provides, in pertinent part, that:

> No government shall impose a substantial burden on the religious exercise of
> a person residing in or confined to an institution . . . unless the government
> demonstrates that imposition of the burden on that person—
>      (1) is in furtherance of a compelling governmental interest; and

---

[13] Shabazz first claims that Thornton's assertion that these foods contain pork is "an
outright lie," but then states, "[i]f any of these food[s] do[ ] contain pork derivatives, I am
definitely unaware of it." (Shabazz Aff. ¶ 8.)  He also claims that he "eat[s] these food[s]
because I am forced to supplement the inadequate Common Fare diet that I am compelled to
accept or eat from the regular prison menu." (*Id.*)  Shabazz offers no evidence that the
commissary only offers foods that are processed, artificial, or contain pork derivatives.

[14] The Court employs the pagination assigned by the CM/ECF docketing system for the
citations to Enclosure C.  Defendants docketed Enclosure C in two parts:  ECF Nos. 61–2 and
61–3.

> **(2)** is the least restrictive means of furthering that compelling
> governmental interest.

42 U.S.C. § 2000cc–1(a).  Thus, to begin, Shabazz must demonstrate that Defendants' policies

impose a "substantial burden" on his religious exercise.  In determining if Shabazz has met this

standard, the Court must answer two questions:  "(1) Is the burdened activity 'religious exercise,'

and if so (2) is the burden 'substantial'?"  *Adkins v. Kaspar*, 393 F.3d 559, 567 (5th Cir. 2004);

*see Couch v. Jabe*, 679 F.3d 197, 200–01 (4th Cir. 2012) (employing similar two-part inquiry).

**B.     The Burdened Activity Is a Religious Exercise**

"RLUIPA defines the term 'religious exercise' broadly to include 'any exercise of

religion, whether or not compelled by, or central to, a system of religious belief.'"  *Couch*, 679

F.3d at 200 (quoting 42 U.S.C. § 2000cc–5(7)(A)).  Shabazz's claim implicates one activity:

eating a diet consistent with the book *How to Eat to Live* by Elijah Muhammad (Claim One (b)).

Shabazz swears that his faith motivates him to eat a diet consistent with *How to Eat to Live*.

(Compl. ¶ 18.)

**C.     Shabazz Fails to Demonstrate a Substantial Burden on His Religious
         Exercise**

**1.     Applicable Law**

RLUIPA fails to define the term substantial burden.  *See Couch*, 679 F.3d at 200.  The

United States Court of Appeals for the Fourth Circuit determined that the Supreme Court's

jurisprudence interpreting the Free Exercise Clause provides guidance on the issue.  *See*

*Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006).  Thus, the Fourth Circuit has explained that a

substantial burden

> is one that put[s] substantial pressure on an adherent to modify his behavior and to
> violate his beliefs, or one that forces a person to choose between following the
> precepts of h[is] religion and forfeiting [governmental] benefits, on the one hand,
> and abandoning one of the precepts of h[is] religion . . . on the other hand.

13

*Couch*, 679 F.3d at 200 (alterations and omission in original) (quoting *Lovelace*, 472 F.3d at 187). In conducting the substantial burden inquiry, the plaintiff "is not required . . . to prove that the exercise at issue is required by or essential to his [or her] religion." *Krieger v. Brown*, 496 F. App'x 322, 325 (4th Cir. 2012) (citing *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005)). Nevertheless, "at a minimum the substantial burden test requires that a RLUIPA plaintiff demonstrate that the government's denial of a particular religious . . . observance was more than an inconvenience to one's religious practice." *Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007) (citing *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1227 (11th Cir. 2004));[15] *see Krieger*, 496 F. App'x at 326 (affirming grant of summary judgment where inmate failed to "show that the deprivation of an outdoor worship circle and the requested sacred items modified his behavior and violated his religious beliefs" (citing *Lovelace*, 472 F.3d at 187)). Thus, no substantial burden occurs if the government action merely makes the "religious exercise more expensive or difficult," but fails to pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his religion. *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 739 (6th Cir. 2007).

Two recent cases from the Fourth Circuit illustrate a plaintiff's responsibility with respect to demonstrating a substantial burden. In *Couch*, the plaintiff "testified that the primary religious texts of Islam command that he grow a beard and that the refusal to maintain a beard is a sin comparable in severity to eating pork." *Couch*, 679 F.3d at 200. The VDOC's grooming policy prohibited inmates from growing beards and enforced this rule by placing a noncompliant inmate in a program that restricted or limited the inmate's "access to personal property, movement

---

[15] In *Sossamon v. Texas*, 131 S. Ct. 1651, 1663 (2011), the Supreme Court abrogated *Smith*'s ultimate holding that RLUIPA allows for monetary damages against state officials acting in their official capacity.

rights, the right to eat and associate with others, recreation time, and visitation time." *Id.* at 199. The Fourth Circuit concluded that VDOC's grooming policy and enforcement mechanism, "fit squarely within the accepted definition of 'substantial burden'" because it placed substantial pressure on the plaintiff to modify his behavior and violate his beliefs. *Id.* at 200–01 (citing *Warsoldier v. Woodford*, 418 F.3d 989, 995–96 (9th Cir. 2005)).

In *Krieger*, the Fourth Circuit declined to find an inmate had demonstrated a substantial burden where prison officials denied "his requests for an 'outdoor worship circle' and certain 'sacred items' related to his religious practice of Asatru." *Krieger*, 496 F. App'x at 322. The plaintiff "asserted that deprivation of the outdoor worship circle would require him to pray indoors, and that the 'Blot' ceremony is '*best* performed outdoors.'" *Id.* at 325 (emphasis added). The Fourth Circuit concluded that the mere denial of the optimal manner for performing the "Blot" ceremony could not demonstrate a substantial burden where the plaintiff "failed to offer any explanation regarding the reason why indoor worship would compromise his religious beliefs." *Id.* Similarly, the inmate failed to demonstrate a substantial burden with respect to the denial of additional sacred items simply by the "blanket assertion" that "the sacred items were 'necessary' to perform 'well-established rituals.'" *Id.* at 326. The Fourth Circuit noted that plaintiff "did not identify those rituals, or explain why the absence of the sacred items had an impact on the rituals and violated his beliefs." *Id.*

*Krieger* illuminates another consideration in conducting the substantial burden inquiry. The availability to an inmate, in the most general sense, of other means to practice his or her faith is not relevant to the RLUIPA substantial burden inquiry. *Al–Amin v. Shear*, 325 F. App'x 190, 193 (4th Cir. 2009). "Nevertheless, courts properly consider whether the inmate retains other means for engaging in the particular religious activity, such as the "Blot" ceremony, in

assessing whether a denial of the inmate's preferred method for engaging that religious exercise imposes a substantial burden." *Shabazz v. Va. Dep't Corr.*, 3:10CV638, 2013 WL 1098102, at *7 (E.D. Va. Mar. 15, 2013) (citing *Krieger*, 496 F. App'x at 326; *Coleman v. Governor of Mich.*, 413 F. App'x 866, 875–76 (6th Cir. 2011)). Thus, an inmate failed to demonstrate the denial of additional group study time imposed a substantial burden upon his religious exercise where prison officials already provided three hours of group study and worship time and allowed inmate to study in his cell. *See Van Wyhe v. Reisch*, 581 F.3d 639, 656–57 (8th Cir. 2009). Similarly, the United States Court of Appeals for the Sixth Circuit concluded that prison policies which limited the inmates' access to religious radio and television broadcasts failed to substantially burden the inmates' religious exercise because the inmates "may receive religious literature via the mail and may receive visitors at the prison to discuss their religious beliefs." *Coleman*, 413 F. App'x at 876.

### 2.   No Substantial Burden

Shabazz avers that "the Common Fare diet 'does not' accommodate his religious dietary tenets" as explained in "*How to Eat to Live* by the Most Honorable Elijah Muhammad . . . ." (Compl. ¶ 18.) Shabazz alleges in his Complaint that the Common Fare diet is inadequate for two reasons: (1) because his "dietary tenets, require[ ] him to train himself to eat only one (1) meal every twenty-four hours, with no in between snacks" (*id.*); and (2) and his religion requires him to be a vegetarian. (*Id.*) In Johnathan Lee X Smith's affidavit, Smith expands upon Shabazz's claim as alleged in the Complaint and avers that dozens of menu items included in the Common Fare diet are forbidden by the religious dictates in *How to Eat to Live*. (*See* Smith Aff. ¶¶ 18–25.)

16

Shabazz fails to demonstrate a substantial burden on his religious exercise. Shabazz fails to demonstrate that the VDOC's provision of the Common Fare diet places pressure on him to violate his religious beliefs or abandon one of the precepts of his religion. *Living Water Church of God*, 258 F. App'x at 739. First, the evidence reveals inconsistency in the composition of the diet that Shabazz desires and claims is religiously mandated. Thus, it is difficult to ascertain whether the Common Fare diet, as provided, frustrates Shabazz's ability to eat in accordance with his alleged religious requirements. Nevertheless, the evidence establishes that, Shabazz, through his own voluntary food selection, fails to make much effort to follow the religious diet. At most, the evidence demonstrates that the VDOC's provision of the Common Fare diet, and not an individualized NOI diet, merely makes Shabazz's "religious exercise more . . . difficult." *Id.*

### a. Eating Once A Day

Shabazz's sworn statements about his desired religious diet are inconsistent. In his Complaint, Shabazz claims that he desires to eat one meal a day. (Compl. ¶ 18.) In his affidavit, Shabazz claims that, to accommodate his desired religious diet, prison officials could "compose for me a Nation of Islam diet consisting of *three* nutritionally balanced meals daily and make them available for me." (Shabazz Aff. ¶ 12 (emphasis added).) Thus, from Shabazz's own submissions it is unclear whether Shabazz swears his religion requires him to eat once a day or more than once a day. Moreover, these inconsistencies cast doubt on the religious import of eating only once a day.

Defendants put forth uncontroverted evidence that Shabazz may choose from the meal options available to him to eat once a day. (Thornton Aff. ¶ 13.) Shabazz admits that he could eat once a day under the present system because "prison officials have no control over whether I

consume one, two, or three meals daily." (Shabazz Aff. ¶ 12.)  Because Shabazz swears

Defendants do not prevent him from eating only once a day if he so chooses, and Shabazz's

submissions fail to definitively establish his desire to eat once a day, on the present record,

Shabazz fails to demonstrate that Defendants' current provision of the Common Fare diet three

times a day substantially burdens his religious exercise. *See Alba v. Merrill Lynch & Co.*, 198 F.

App'x. 288, 300 (4th Cir. 2006) (explaining that "'[a] genuine issue of material fact is not

created where the only issue of fact is to determine which of the two conflicting versions of the

plaintiff's testimony is correct.'" (quoting *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir.

1984))).

### b.    Vegetarian Diet

Shabazz also swears that his religion requires him to eat a vegetarian diet.  Defendants

provide inmates desiring a religious diet with the Common Fare diet.  The Common Fare diet

contains fish; however, inmates desiring a vegetarian diet, such as Shabazz, need not eat the fish

portion. (Thornton Aff. ¶ 10.)  Because the evidence establishes that Shabazz may eat the items

that comply with his vegetarian diet, he fails to demonstrate that the provision of the Common

Fare diet substantially burdens his religious desire for a vegetarian diet. *See Muhammad v.*

*Mathena*, No. 7:14–cv–00134, 2015 WL 300363, at *3 (W.D. Va. Jan. 22, 2015) (explaining no

substantial burden exists when inmate can discard food "at odds with" his religious diet (citing

*Frazier v. Ferguson*, No. 04–5140, 2006 WL 2052421, at *4 (W.D. Ark. June 28, 2006))).

Additionally, despite Shabazz's sworn statements that his religion requires him to

consume a vegetarian diet, the evidence demonstrates that Shabazz, on his own initiative, ate fish

and pork derivatives.  Indeed, Shabazz filed grievances complaining that the portion of fish he

received was too small.  Shabazz himself chose to consume these prohibited items although

18

Defendants provided him with the ability to eat a vegetarian diet. Thus, the unrefuted evidence establishes that Shabazz fails to comply with all of the dietary practices which he claims are dictated by his faith. *Cf. McKennie v. Texas Dep't of Crim Justice*, No. A–08–CV–906–LY, 2012 WL 443948, at *11 (W.D. Tex. Feb. 10, 2012) (explaining that inmate "can hardly complain" that Defendant's failure to provide him with desired vegan diet "substantially burdens his religion when he supplements his diet with nonvegan food items" from the commissary); *Ford v. Fed. Bureau of Prisons*, No. 09–cv–00882–LTB–BNB, 2011 WL 2415790, at *9–10 (D. Colo. May 24, 2011) (concluding that plaintiff failed to "establish a prima facie case regarding whether he has sincere religious beliefs based on the *How to Eat to Live* books" when unrefuted evidence demonstrated personal practices that vary from its tenets). Again, Shabazz fails to demonstrate that Defendants' provision of the Common Fare diet substantially burdens his religious exercise because Shabazz may choose a vegetarian diet.

### c.   Food Items Forbidden by *How to Eat to Live*

Shabazz also claims that he desires a diet consistent with the book *How to Eat to Live*. Johnathan Lee X Smith, not Shabazz, provides the specific teachings in the book and identifies items that Elijah Muhammad instructs followers of NOI to avoid. To the extent that eating a diet consistent with *How to Eat to Live* is a requirement of Shabazz's religion,[16] Shabazz fails to

---

[16] Shabazz claims that he "desires" to eat one meal a day and eat no meat, dairy or seafood. (Shabazz Decl. ¶ 13.) Defendants assert that this language fails to cite a religious compulsion for such restrictions. Moreover, courts have found that *How to Eat to Live* and the writings of Elijah Muhammad provide guidance to Nation of Islam adherents on healthy eating, and are not the issuance of a religious mandate to eat in accordance with the book. *See Farrakhan v. Johnson*, No. 1:08cv438 (TSE/JFA), 2009 WL 1360864, at *7 (E.D. Va. May 13, 2009) (categorizing inmate's complaints about "offensive" foods based on writings by Elijah Muhammad as secular); *Jones v. Shabazz*, No. H–06–1119, 2007 WL 2873042, at *13 (S.D. Tex. Sept. 28, 2007) (explaining that "[t]hese exhibits do not show Muhammad is issuing a religious mandate that not eating potatoes, beans, or bread is a matter of religious doctrine, but rather, they tend to show discourses by Muhammad about healthy eating habits"), *aff'd* 352 F. App'x 910,

demonstrate that the provision of the Common Fare diet has placed substantial pressure on him to modify his behavior or beliefs. *Living Water Church of God*, 258 F. App'x at 739.

First, Smith provides a long list of food items he claims that *How to Eat to Live* forbids; some of these items are served as part of the Common Fare diet. Shabazz, however, fails to provide the religious significance of avoiding these foods. For example, Smith states that *How to Eat to Live* requires Shabazz to avoid foods like dry cereal, peanut butter, white bread, "freshly baked bread," and certain vegetables and beans, but allows him to eat "whole wheat bread that has been slowly baked twice and then allowed to set for 2-3 days," "navy (pea) beans," "browned rice" and certain "fresh, cooked" vegetables. (Smith Aff. ¶¶ 18, 20, 25.) Smith states that NOI adherents should not eat raw vegetables or canned vegetables or stir-fried vegetables, but must eat "fresh, cooked" vegetables. (*Id.* ¶¶ 18, 20.) While Smith states that *How to Eat to Live* advises that raw vegetables should be avoided because they hard to digest and may contain pesticides (*id.* ¶ 25), Shabazz fails to demonstrate the religious significance of avoiding consuming raw, canned, or stir-fried vegetables. Smith also states that "[o]ur drinking water must be boiled and strained with cheese before we drink it," but wholly fails to explain how this is possible or why it is religiously mandated. (*Id.* ¶ 18.)

Smith's affidavits and Shabazz's various submissions are also inherently contradictory in their description of the foods that their religion requires them to avoid. As just discussed, Smith

916 (5th Cir. 2009) (affirming district court and explaining that inmate's "personal[ ] belie[f] that he may not eat those foods" failed to demonstrate that those foods are prohibited by his NOI faith); *Muhammad v. Warithu-Deen Umar*, 98 F. Supp. 2d 337, 345 n.3 (W.D.N.Y. 2000) (explaining that in "'How to Eat to Live,' Elijah Muhammad sets forth both general and specific dietary guidelines for 'good health and prolongation of life'"); *cf. DePaola v. Va. Dep't of Corr.*, No. 7:12CV00592, 2014 WL 3956108, at *3–4 (W.D. Va. Aug. 12, 2014) (finding NOI inmate offered "nothing to support his claim that his desire to avoid eating white bread, peanut products, grapefruit, cottage cheese, and peas is based on a sincerely held religious belief rather than a merely secular, personal preference" and thus, the Common Fare diet "substantially accommodates his religious dietary needs").

states that *How to Eat to Live* expressly prohibits eating "canned food," but Smith later admits that canned vegetables would be acceptable for a NOI adherent. (Smith Aff. II ¶ 4.) Shabazz avers that he desires to eat a diet free of dairy products (Shabazz Decl. ¶ 13), however, in his lengthy list of prohibitions, Smith fails to mention dairy as a prohibited food. Smith also claims that he is forbidden from eating food "that has been prepared and cooked by disbelievers or unbelievers in our Islamic faith." (Smith Aff. ¶ 21.) Not only does Shabazz fail to explain the religious significance of requiring only believers to prepare his food, he also readily admits that he purchases and consumes pre-packaged food from the commissary and fails to square his consumption of this food with Smith's statement about the prohibition of processed foods. Simply put, "'[a] genuine issue of fact is not created where the only issue of fact is to determine which of the two conflicting versions of a party's [evidence] is correct.'" *Erwin v. United States*, 591 F.3d 313, 325 n.7 (4th Cir. 2010) (alterations in original) (quoting *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 198 (4th Cir. 1997)).

Second, Shabazz fails to demonstrate that Defendants forced him to eat the foods he claims are offensive. As previously discussed, Shabazz may simply discard the foods provided in the Common Fare diet that he believes are inconsistent with *How to Eat to Live*, eat the foods that he believes comply with these teachings, and supplement his diet with foods from the commissary. *See Muhammad*, 2015 WL 300363, at *3 (citing *Frazier*, 2006 WL 2052421, at *4).

While Shabazz vaguely suggests that he has lost weight, he puts forth no evidence that he has suffered any adverse medical concerns from the provision of the Common Fare diet. *See DePaola*, 2014 WL 3956108, at *4 (concluding that assertions that inmate "feels hungry and sometimes loses weight eating only the portions of the common menu that meet his stated

preferences, he does not allege any resulting medical concerns that have caused him to seek treatment," and fails to prove the "common fare menu substantially burdens his religious practice"). At most, Shabazz states: "[T]he prison officials have refused, and continue to refuse, to provide Plaintiff a year-round N.O.I. diet. 2) Plaintiff has lost about 20 lbs. of his bodily weight and has suffered emotional distress and mental anguish as a direct and proximate result thereof." (Compl. ¶ 30.) Shabazz provides no context for this claimed weight loss. For example, he fails to provide his starting weight or the percentage of weight that he lost and over what time period, and if this weight loss truly posed adverse health effects.[17] Conclusory assertions of this ilk, without any factual support showing that he suffered harm, fail to demonstrate that the lack of a diet that complies with *How to Eat to Live* imposed a substantial burden on Shabazz's religious exercise. *Krieger*, 496 F. App'x at 326; *United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004) (citation omitted) (concluding that "[a]iry generalities [and] conclusory assertions . . . [do] not suffice to stave off summary judgment . . . .").

Third, despite swearing that his religion requires him to eat in accordance with *How to Eat to Live*, in his personal food consumption, Shabazz feels free to ignore the dictates of *How to Eat to Live*. The record establishes that Shabazz himself fails to follow the dietary tenets that he claims are essential to his faith as described in *How to Eat to Live*, as he eats fish, dairy, pork derivatives, processed foods, and artificial ingredients. *See Ford*, 2011 WL 2415790, at *9–10. Thus, Shabazz fails to demonstrate that Defendants' provision of the Common Fare diet and the presence of prohibited foods on that diet pressures him to violate his religious beliefs or abandon

---

[17] The Court notes that Shabazz filed abundant grievances and never mentioned weight loss, hunger, or any other need for medical attention. Moreover, at the time of Shabazz's initial filing of the instant action, Shabazz maintained an average monthly balance of $166.32 in his inmate account. (ECF No. 4, at 1.) Thus, Shabazz had sufficient funds to purchase foods to supplement his caloric intake if the Common Fare diet failed to provide adequate nutrition that aligned with his religious tenets on any given day.

one of the precepts of his religion. *Cf. Jones*, 2007 WL 2873042, at *13 (finding food items

identified in *How to Eat to Live* as foods to avoid, "are not [foods] prohibited by NOI

principles," and thus, "fails to raise a material fact issue" that provision of such foods

"constitutes a substantial burden on the exercise of his religious beliefs in violation of

RLUIPA"). Shabazz's lack of effort to comply with the tenets of his religious diet through his

own food choices, supports the proposition that Defendants' actions are not a substantial burden

to his religious practice. *Cf. McKennie*, 2012 WL 443948, at *11. On the present record, no

reasonable juror would conclude that Defendants' substantially burdened Shabazz's religious

exercise by providing him with the Common Fare diet. For this reason alone, Claim One (b) will

be DISMISSED.

> **D.    Common Fare Diet Furthers Compelling State Interests by the Least
> Restrictive Means**

Even if Shabazz had demonstrated that Defendants' provision of the Common Fare diet

somehow substantially burdened his religious exercise, as discussed below, Defendants have

established that the Common Fare diet furthers compelling state interests of uniformity, cost-

efficiency, and maintaining inmate health, by the least restrictive means.

If an inmate establishes a substantial burden on his religious exercise, the defendants

must show that the policy is the least restrictive means of furthering a compelling government

interest. *Lovelace*, 472 F.3d at 189. Courts must give "due deference to the experience and

expertise of prison and jail administrators in establishing necessary regulations and procedures to

maintain good order, security and discipline, consistent with consideration of costs and limited

resources." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (citations omitted) (internal quotation

marks omitted). "RLUIPA . . . is not meant to elevate accommodation of religious observances

over the institutional need to maintain, good order, security, and discipline or to control costs."
*Baranowski v. Hart*, 486 F.3d 112, 125 (5th Cir. 2007) (citation omitted).

This case epitomizes the difficulty for prison officials to hit a moving target with respect
to accommodating individual inmate's religious needs.  In the present action, Shabazz makes it
difficult for Defendants or the Court to assess whether the Common Fare diet is the least
restrictive means to address Shabazz's desired religious diet because he fails to explain with any
consistency exactly what diet he desires.  Nevertheless, on the current record, the Court
concludes that the Common Fare diet is the least restrictive means to provide for the religious
needs of inmates.

The evidence establishes that the VDOC undertook substantial effort to design and
implement a single, centralized food program that has been certified by both nutritionists and
religious experts as accommodating all recognized religions.  (Thornton Aff. ¶ 6; Engelke Aff.
¶¶ 4–5.)  The uncontroverted evidence demonstrates that the centralized Common Fare menu and
procedures further compelling state interests of uniformity and cost-efficiency.  *See Muhammad*,
2015 WL 300363, at *3 n.4 (finding Common Fare diet furthers compelling interests of cost
efficiency and uniformity); *DePaola*, 2014 WL 3956108, at *4 (finding "self-evident" that
Common Fare menu "furthers legitimate and neutral VDOC interests in cost-efficient, uniform
procedures by which to accommodate inmates' religious dietary beliefs properly at numerous
facilities in the VDOC system"); *cf. Baranowski*, 486 F.3d at 125 (citation omitted) (finding
policy refusing to provide inmate with individualized diet "is related to maintaining good order
and controlling costs and, as such, involves compelling governmental interests"); *Wortham v.
Lantz*, No. 3:10–cv–1127 (DJS), 2014 WL 4073201, at * 4 (D. Conn. Aug. 13, 2014) (citation
omitted) (internal quotation marks omitted) (explaining that Connecticut's requirement "for

24

inmates to utilize the Common Fare menu and not providing them with halal meat did not violate . . . RLUIPA, since that requirement was in furtherance of compelling governmental interests including prison security, controlling costs and maintaining workable administrative procedures").

Providing different menu items to different religions and serving inmates meals at varying times would be cost and labor-prohibitive. (Thornton Aff. ¶ 5); cf. *Heard v. Caruso*, No. 2:05–cv–231, 2012 WL 951698, at *3–5 (W.D. Mich. Mar. 20, 2012) ("given the length of the prohibited list of foods" in *How to Eat to Live*, "significant additional food costs would be attendant to attempt to provide nutritious food consistent with the NOI diet and also provide for the dietary needs of all other prisoners in the system"). Providing an individualized system would impose extensive administrative and food costs, would require the purchase of new kitchen equipment, would require new construction to accommodate food storage and preparation, would require more staff, and would require longer dining hall times and longer work hours for kitchen staff including inmate workers. (Thornton Aff. ¶¶ 5, 7); cf. *Cutter*, 544 U.S. at 726 ("Should inmate requests for religious accommodations become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of tan institution, the facility would be free to resist the imposition.") Accommodating individual religious diets would also increase security concerns by requiring greater offender movement within the institution for meals. (Thornton Aff. ¶ 7.)

In addition, the VDOC has a compelling interest in uniformity in the manner it treats religious groups, and must avoid providing individualized diets for each religion or religious sect. The impact of special individualized treatment for certain religions "could result in the perception that certain inmates are favored over others, which would have an adverse impact on

prison morale." *Baranowski*, 486 F.3d at 122 (citation omitted).  Such individualized treatment would spawn "increased demand by other religious groups for similar diets." *Id.* at 125.

The VDOC purchases and cooks food for the Common Fare diet in bulk and the fruits and vegetables served are based on seasonal availability.  (Thornton Aff. ¶ 10.)  Fresh produce has a limited shelf life.  (*Id.*)  Many of the fresh vegetables Shabazz claims he may eat, such as cooked spinach, cauliflower, rhubarb, eggplant, red cabbage, brussel sprouts, and turnip root "are not readily available year round and if they were purchased in bulk much would be wasted because many offenders would not eat them." (*Id.* ¶ 11.)

Moreover, provision of the Common Fare diet furthers the compelling state interest of maintaining inmate health.  VDOC nutritionists developed the Common Fare diet to provide inmates who require certain religious diets with adequate and balanced nutrition.  (Engelke Aff. ¶¶ 4–5.)  The diet outlined in *How to Eat to Live* would be comprised predominantly vegetables in large quantities and the diet lacks valuable sources of nutrients that are provided in the Common Fare diet.  (Thornton Aff. ¶¶ 8–9.)  Eating the 2700 to 3000 calories a day required to sustain inmate health in a diet comprised mostly of a large quantity of vegetables and served as one meal a day would place inmates at risk for health problems. *Cf. Heard*, 2012 WL 951698, at *3–5 (finding "consumption of 2900 calories at one meal was violative of nutritional norms and therefore in violation of [institution's] policy to provide adequate sustenance for prisoners" and potentially in violation of the Eighth Amendment).[18]

---

[18] Smith, not Shabazz, counters that "I have sustained myself eating only one meal every twenty-four (24) hours consisting of food approved by *How to Eat to Live*. I did not incur any health problems . . . my physicians used to tell me that I was more healthy than people who eat three (3) meals daily and eat all day long between those meals." (Smith Aff. II ¶ 8.) Smith's opinion about the healthiness of the diet Shabazz seeks, based on Smith's dietary habits and health at some point in the unidentified past, fails to create a genuine dispute of material fact. *Cf. Hogge v. Stephens*, No. 3:09CV582, 2011 WL 2161100, at *6 (E.D. Va. June 1, 2011)

In sum, requiring the VDOC to specially accommodate "NOI adherents and every one of the other . . . religious sects in the [VDOC] would create undue burdens on the prison administration" and the Common Fare diet "represents the least restrictive means available for handling religious dietary issues." *Jones*, 352 F. App'x at 916 (finding policy that offered standardized pork alternatives to all inmates requiring religious diet, including NOI adherents, furthered compelling state interests by the least restrictive means (citing *Baranowski*, 486 F.3d at 122)); *see Muhammad*, 2015 WL 300363, at *3 n.4 (holding Common Fare diet is the least restrictive means for provision of religious diets to inmates); *DePaola*, 2014 WL 3956108, at *4 (same); *Wortham*, 2014 WL 4073201, at *4 (granting summary judgment for defendants' on RLUIPA challenge, in light of evidence "that an attempt to accommodate the plaintiff's dietary requests would involve significant costs and present serious security and administrative problems").

Shabazz counters that "forcing him to accept the Common Fare diet instead of providing him an annual diet that is reasonably consistent with *How to Eat to Live* is **not** the least restrictive means of achieving a compelling government interest." (Resp. Mot. Summ. J. ¶ 4.) Shabazz claims that "when the Nation of Islam observes its annual Ramadan, the VDOC provides each member with two (2) hot meals and one (1) meal for 30 days." (*Id.*) Shabazz claims that the Ramadan diet "could be made available to Plaintiff 365 days a year without violating any of Defendants' compelling government interest." (*Id.*) Shabazz states that despite being served three meals during Ramadan, "most of us eat only one meal every 24 hours – with nothing in between." (Shabazz Aff. ¶ 10.) Shabazz concludes: "Our Ramadan menu is most akin to the dietary tenets contained in *How to Eat to Live* . . . ." (*Id.*) The Court fails to discern,

---

(observing that "a prisoner 'wholly lacking in medical knowledge' may not give expert medical testimony" (quoting *Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001))).

and Shabazz fails to demonstrate, how receiving the Ramadan diet year round would accommodate Shabazz's religious desire to eat only once daily any more than the Common Fare diet, as Shabazz claims that the Ramadan diet, like the Common Fare diet, is served in three meals a day. Shabazz also fails to offer any evidence to support his conclusory assertion that the Ramadan meal, served three times a day, more closely comports with the diet set forth in *How to Eat to Live. See Roane*, 378 F.3d at 400–01 (citation omitted).[19] Accordingly, Shabazz fails to "offer [ ] any less burdensome alternative to a single, centralized common fare program that would accomplish the legitimate goal of uniform accommodation of inmates' religious dietary needs." *DePaola*, 2014 WL 3956108, *4.

The uncontroverted evidence demonstrates that Defendants' provision of the Common Fare diet to Shabazz furthers compelling government interests by the least restrictive means. Accordingly, Claim One (b) will be DISMISSED.

### E.   Free Exercise

Similar to RLUIPA, in order for Shabazz to survive summary judgment for his First Amendment claim, Shabazz must demonstrate Defendants' conduct substantially burdens his religious exercise. *Whitehouse v. Johnson*, No. 1:10cv1175 (CMH/JFA), 2011 WL 5843622, at *5 (E.D. Va. Nov. 18, 2011). "RLUIPA provides considerably more protection for an inmate's religious exercise than does the Free Exercise Clause of the Constitution of the United States." *Id.* at *5 (citing *Lovelace*, 472 F.3d at 186). Thus, "[w]here an inmate has not put forth sufficient evidence under RLUIPA to demonstrate a substantial burden on his religious exercise, his claim fails under the Free Exercise Clause of the First Amendment as well." *Van Wyhe*, 581 F.3d at 657–58 (citing *Patel v. U.S. Bureau of Prisons*, 515 F.3d 807, 813 (8th Cir. 2008)). As

---

[19] Shabazz fails to identify the food items served in the Ramadan diet.

explained above, Shabazz has failed to demonstrate a substantial burden on his religious exercise.  Accordingly, Claim One (a) will be DISMISSED.

## V. CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (ECF No. 60) will be GRANTED.

An appropriate Order shall accompany this Memorandum Opinion.

Date: July 2, 2015
Richmond, Virginia

/s/
James R. Spencer
Senior U.S. District Judge